# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 27966/31928

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | Boise, August 2009 Term |
| | ) | |
| Plaintiff-Respondent-Cross Appellant, | ) | 2010 Opinion No. 59 |
| | ) | |
| v. | ) | Filed: June 1, 2010 |
| | ) | |
| DALE CARTER SHACKELFORD, | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| Defendant-Appellant-Cross Respondent. | ) | SUBSTITUTE OPINION. THE |
| | ) | COURT'S PRIOR OPINION |
| | ) | DATED JANUARY 20, 2010, IS |
| | ) | HEREBY WITHDRAWN. |

Appeal from the District Court of the Second Judicial District, State of Idaho, Latah County. Hon. John R. Stegner, District Judge.

Judgment of conviction for first-degree murder, conspiracy to commit first-degree murder, first-degree arson, conspiracy to commit first-degree arson and preparing false evidence, affirmed. Case remanded for resentencing.

Griffard Law Offices, Boise, for appellant. Leo N. Griffard, Jr., argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for appellant. L. Lamont Anderson argued.

---

BURDICK, Justice

Dale Carter Shackelford appeals from his judgment of conviction, based upon jury verdicts finding him guilty of the first-degree murders of Donna Fontaine and Fred Palahniuk, conspiracy to commit first-degree murder, first-degree arson, conspiracy to commit first-degree arson, and preparing false evidence. He also appeals from his sentences of death for first-degree murder, as well as the partial denial of his claims for post-conviction relief. The State cross-appeals, challenging the district court's grant of post-conviction relief, which set aside Shackelford's death sentences and requires resentencing. We find that any error committed by the district court was harmless, and we therefore affirm on all issues. We affirm the district court's order for resentencing on different grounds.

1

# I. FACTUAL AND PROCEDURAL BACKGROUND

Dale Shackelford was convicted of the murders of his ex-wife, Donna Fontaine, and her boyfriend, Fred Palahniuk, which occurred near the Latah County town of Kendrick, Idaho, in May 1999. The State alleged that Shackelford conspired with Martha Millar, Bernadette Lasater, Mary Abitz, Sonja Abitz, and, John Abitz.[1] Millar and Lasater worked for Shackelford's trucking business, Shackelford Enterprises, in Missouri. The Abitz family lived near the residence where the bodies of Donna and Fred were found. Sonja Abitz was Shackelford's fiancée at the time of the murders, and John and Mary Abitz are Sonja's parents. The alleged conspirators eventually pled guilty to charges related to the murders.

Shackelford and Donna married in Missouri in December 1995 and the relationship ended in the summer of 1997, with the couple divorcing in November of that year. Donna accused Shackelford of raping her in July 1997, and charges were filed in 1998. In the spring of 1999, Donna developed a relationship with Fred and, on May 28, 1999, the two visited Donna's brother, Gary Fontaine, at the home Gary and Donna's daughter owned together outside of Kendrick. The morning of May 29, Donna, Fred, and Gary went to the Locust Blossom Festival in Kendrick, where they met John, Mary, and Sonja Abitz.

After leaving the festival, Gary went to the Abitz's house, but he left around dark, returned home, noticed Donna's pickup in the driveway, and smelled smoke. Gary called the Abitz's house and reported that his two-story garage was on fire. Mary, Sonja, Ted Meske (Mary's brother), and Shackelford arrived at the fire and various individuals tried to extinguish it, but were unsuccessful.

At 7:40 p.m., Latah County Sheriff Patrol Deputy Richard Skiles was called to investigate the fire at 2168 Three Bear Road. When Skiles arrived at the scene, nearly an hour later, he observed several persons—including Gary Fontaine, Mary Abitz, Sonja Abitz, Brian Abitz (Sonja's brother), Ted Meske, and Shackelford—standing near the garage that was completely engulfed in flames. Based upon information obtained from Ted and Shackelford, Deputy Skiles contacted dispatch to have an on-call detective sent "because there was a possibility there could be a suicide victim in the fire." By the time the fire department arrived, the garage had been utterly destroyed. Several hours later, after the fire had been extinguished,

---

[1] The charges against John Abitz were eventually dismissed.

two bodies were found in the rubble. The bodies were subsequently identified as the remains of Donna and Fred. At trial, a state fire investigator testified as to his opinion that the fire was arson.

Doctor Robert Cihak conducted autopsies of the remains, which were severely burned. Shotgun pellets were found in Donna's right chest region and a bullet was found in the back of her neck. Dr. Cihak opined that the bullet wound was fatal and was inflicted when Donna was still alive. A bullet was also found in Fred's body behind the upper breastbone, which Dr. Cihak concluded was the cause of death. Dr. Cihak offered his opinion that Donna and Fred were dead at the time of the fire.

Shackelford was indicted on February 11, 2000, and charged with two counts of first-degree murder, first-degree arson, conspiracy to commit first-degree murder, conspiracy to commit arson, and preparing false evidence. Trial began on October 16, 2000, and concluded December 22, 2000. The jury returned guilty verdicts on all counts charged in the Indictment. Sentencing commenced on August 27, 2001, and, on October 25, 2001, the district court read its Findings of the Court in Considering Death Penalty. As to Donna's murder, the court found that the State had proven beyond a reasonable doubt two statutory aggravating factors: I.C. § 19-2515(h)(2) (2000) and I.C. § 19-2515(h)(10) (2000).[2] As to Fred's murder, the court found the statutory aggravating factor under I.C. § 19-2515(h)(2) (2000). After weighing the mitigating factors against the individual statutory aggravating factors, the court concluded that the mitigating factors were not sufficiently compelling to render the death penalty unjust, and sentenced Shackelford to death for both first-degree murders. Shackelford was also given prison sentences for the other felony offenses. The judgment of conviction was filed November 1, 2001. Shackelford appeals from his convictions.

On April 8, 2005, the district court addressed the parties' motions for summary disposition regarding Shackelford's petitions for post-conviction relief. The court granted Shackelford sentencing relief, concluding that *Ring v. Arizona,* 536 U.S. 584 (2002), mandated that the jury conduct the weighing of aggravating and mitigating factors. The court therefore ordered that Shackelford's death sentences be set aside. The court then rejected Shackelford's other *Ring* claim that the jury must find any aggravating factors, concluding that the jury's

---

[2] The statutes are currently codified at I.C. §§ 19-2515(9)(b) and (9)(k) and consist of identical language.

verdict established that Shackelford murdered Donna and Fred at the same location and date, thereby establishing the multiple-murder aggravator pursuant to I.C. § 19-2515(h)(2) (2000). The district court concluded that three of Shackelford's other post-conviction claims were moot based upon the court's decision to provide Shackelford with sentencing relief. All of Shackelford's remaining claims were denied. Shackelford's notice of appeal and the State's notice of cross-appeal were timely filed.

## II. ANALYSIS

Shackelford raises numerous issues in his brief, asserting errors during both the guilt and sentencing phases of his trial. Additionally, the State cross-appeals the district court's decision setting aside Shackelford's death sentences. We will first address Shackelford's claims as to the guilt phase of his trial, and will then turn to the arguments presented regarding sentencing.

### A. Guilt Phase

#### 1. Evidentiary Issues

Shackelford contends that the district court erred in admitting into evidence out-of-court statements made by Donna Fontaine, Sonja Abitz, Mary Abitz, and Robin Eckmann.

##### a. Standard of Review

This Court reviews questions regarding the admissibility of evidence using a mixed standard of review. *State v. Stevens*, 146 Idaho 139, 143, 191 P.3d 217, 221 (2008). First, whether the evidence is relevant is a matter of law that is subject to free review. *State v. Field*, 144 Idaho 559, 569, 165 P.3d 273, 283 (2007). Second, we review the district court's determination of whether the probative value of the evidence outweighs its prejudicial effect for an abuse of discretion. *Stevens*, 146 Idaho at 143, 191 P.3d at 221. We determine whether the district court abused its discretion by examining: (1) whether the court correctly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of its discretion and consistently within the applicable legal standards; and (3) whether the court reached its decision by an exercise of reason. *Id.* However, an abuse of discretion may be deemed harmless if a substantial right is not affected. *State v. Thompson*, 132 Idaho 628, 636, 977 P.2d 890, 898 (1999). "In the case of an incorrect ruling regarding evidence, this Court will grant relief on appeal only if the error affects a substantial right of one of the parties." *Obendorf v. Terra Hug Spray Co.,* 145 Idaho 892, 897, 188 P.3d 834, 839 (2008); I.R.E. 103(a). "Any

4

error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." I.C.R. 52.

**b. The admission of Donna Fontaine's out-of-court statements was in error, but that error was harmless.**

Shackelford first argues that the district court erred in allowing multiple out-of-court statements made by Donna Fontaine to be introduced under Idaho Rule of Evidence 803(3) because (1) Shackelford did not inject the issue of the possibility of suicide into the case; (2) even if he did somehow inject suicide as an issue, the disputed statements bear marginal, if any, relevance to the issue of whether Donna may have been inclined to commit suicide; and (3) the admission of Donna's out-of-court statements expressing her fears of Shackelford was highly prejudicial and the prejudicial effect of such evidence substantially outweighed any probative value.

Conversely, the State maintains that (1) Shackelford's statements drove the initial investigation into whether there may have been a suicide victim in the fire; (2) Donna's state of mind was not only relevant, but "was integral in understanding a significant issue in the case"; and (3) based upon his own statements expressing his desire to kill Donna, the testimony of his co-conspirators, and the forensic evidence, Shackelford has failed to establish a reasonable possibility that the alleged error associated with the admission of testimony regarding Donna's fear contributed to his conviction. We find that the district court abused its discretion in admitting the statements, but the error was harmless.

Six witnesses were allowed to testify as to statements made by Donna expressing her fear that Shackelford was going to harm her. The district court determined that these out-of-court statements were admissible as an exception to the rule against hearsay. Idaho Rule of Evidence 802 states: "Hearsay is not admissible except as provided by these rules or other rules promulgated by the Supreme Court of Idaho." The exception to the hearsay rule under which the district court admitted the evidence in this case is I.R.E. 803(3):

> **Then existing mental, emotional, or physical condition.** A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

5

Limited circumstances exist in which statements made by a murder victim to a third party are admissible under I.R.E. 803(3)'s state of mind exception to the hearsay rule. *State v. Garcia*, 102 Idaho 378, 382, 630 P.2d 665, 669 (1981).[3] The statements may be admitted only after a determination that (1) the declaration is relevant, and (2) the need for and value of such testimony outweighs the possibility of prejudice to the defendant. *Id.* The district court erred in finding that the out-of-court statements made by Donna were relevant; therefore, we need not address whether the value of the testimony outweighed the possibility of prejudice to the defendant.

Evidence that is "'relevant to a material and disputed issue concerning the crime charged'" is generally admissible. *State v. Stevens*, 146 Idaho 139, 143, 191 P.3d 217, 221 (2008) (quoting *State v. Field,* 144 Idaho 559, 569, 165 P.3d 273, 283 (2007)). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." I.R.E. 401; *see also Stevens*, 146 Idaho at 143, 191 P.3d at 221. Whether a fact is "of consequence" or material is determined by its relationship to the legal theories presented by the parties. *State v. Yakovac,* 145 Idaho 437, 444, 180 P.3d 476, 483 (2008).

This Court, in *State v. Goodrich,* recognized four well-defined categories in which a declarant-victim's state of mind is relevant because of its relationship to the legal theories presented by the parties: (1) when the defendant claims self-defense as justification for the killing; (2) when the defendant seeks to build his defense around the fact that the deceased committed suicide evidence introduced which tends to demonstrate that the victim made statements inconsistent with a design to take his or her own life is relevant; (3) when the defendant claims the killing was accidental; and (4) when a specific "mens rea" is in issue. 97 Idaho 472, 477 n.7, 546 P.2d 1180, 1187 n.7 (1976).

In *State v. Garcia*, 102 Idaho 378, 382, 630 P.2d 665, 669 (1981), this Court again referenced the four well-defined categories laid out in *Goodrich*, and also cited to *United States v. Brown*, 490 F.2d 758, 767 (D.C. Cir. 1973), for the D.C. Circuit's further discussion of the first three categories. *Brown* describes the category involving the defense theory of suicide as

---

[3] While the Idaho Rules of Evidence were not adopted until 1985, the "state of mind" exception existed under common law rules of evidence used in Idaho in nearly identical form to I.R.E. 803(3); thus, the analysis remains similar. *See Herrick v. Leuzinger*, 127 Idaho 293, 301, 900 P.2d 201, 209 (Ct. App. 1995).

follows: "[W]here a defendant seeks to defend on the ground that the deceased committed suicide, evidence that the victim had made statements inconsistent with a suicidal bent are highly relevant." 490 F.2d at 767. In *Garcia*, this Court found that the district court had erred in admitting the hearsay testimony of the witness because the defendant's defense had not been based on any of the categories laid out in *Brown* and *Goodrich*. 102 Idaho at 382-83, 630 P.2d at 669-70.

The United States Supreme Court dealt directly with the issue of evidence of a victim's state of mind offered to rebut a defense theory of suicide in *Shepard v. United States*, 290 U.S. 96 (1933). In *Shepard*, the Supreme Court found that the victim's declaration "Dr. Shepard has poisoned me" was neither admissible as a dying declaration (as the State had argued), nor as evidence of the victim's state of mind. *Id*. at 103. The defendant attempted to show that the victim had "exhibited a weariness of life and a readiness to end it," which gave "plausibility to the hypothesis of suicide." *Id*. The Court stated:

> By the proof of these declarations evincing an unhappy state of mind, the defendant opened the door to the offer by the government of declarations evincing a different state of mind, *declarations consistent with the persistence of a will to live*. The defendant would have no grievance if the testimony in rebuttal had been narrowed to that point. What the government put in evidence, however, was something very different. It did not use the declarations by Mrs. Shepard to prove her present thoughts and feelings, or even her thoughts and feelings in times past. It used the declarations as proof of an act committed by some one else, as evidence that she was dying of poison given by her husband.

*Id*. at 103-04 (emphasis added).

In the above-mentioned cases, the relevancy of the state of mind statements was shown through the rebuttal of a defense theory. However, in *State v. Radabaugh*, this Court did not expressly condition the admission of state of mind evidence on it being offered to rebut a defense theory. 93 Idaho 727, 471 P.2d 582 (1970). Instead, the Court stated that "[e]vidence tending to show the mental state of the victim and ill-feeling or hostility between decedent and defendant is admissible" and since the statement "I'm scared to death of him" was "probative of the attitudes and feelings (fear) of the victim towards [defendant], it was properly admitted." *Radabaugh*, 93 Idaho at 731, 471 P.2d at 586. In *State v. Goodrich*, this Court specified that *Radabaugh* had recognized that a state of mind statement may be admissible when the "declarant-victim's state of mind is relevant to an issue involved in the criminal proceedings." 97 Idaho 472, 477, 546 P.2d 1180, 1185 (1976). *Goodrich* then laid out the four categories defined above. Thus, when

7

examining relevancy, we look to whether the fact that the statement was made is relevant to a legal theory presented by the parties.

First, to determine whether the statements here were relevant to rebut a defense theory of suicide, we must determine whether there *was* a defense theory of suicide. The State asserts that Shackelford perpetuated his contention that Donna committed suicide during the course of the investigation and it was his statements that drove the initial investigation. Shackelford argues it was Ted Meske, not him, who first introduced the idea of suicide into the investigation, and Shackelford did not use the theory as a defense at trial.

Shackelford did make statements during the police investigation regarding the possibility that Donna had committed suicide;[4] however, we find that those statements were not sufficient to allow rebuttal of a defense theory of suicide. The defense did not present a theory of suicide during the trial itself. Instead, the State offered testimony regarding Shackelford's statements during the initial investigation about suicide, and the defense merely offered testimony to show that any mention Shackelford made of suicide during the initial investigation did not affect the investigation in any way. Defense counsel questioned Detective Kurtis Hall who testified that, although police had been informed that there may be a suicide victim in the fire, the investigators treated it as a potential homicide:

> A. At that time I didn't know if we had a body or not, but it's my understanding that any death is treated as a potential homicide until it is established—that we investigate is treated [sic] as a potential homicide until it is established otherwise.
>
> Q. And did you treat it that way?
>
> A. Yes.

---

[4] Detective Kurtis Hall testified that when he arrived at the scene of the fire, he was told there may have been a suicide victim in the fire:

> [Shackelford] told me that Donna had—had a bad time recently that she had had an election go against her, that she was up on fraud charges in Missouri that he had raised for the forgery of a check and that—I can't repeat the exact words, but it was something along the lines of, things are crumbling around her right now, she's having a hard time . . . . He said that he thought it was possible that Donna committed suicide.

Deputy Richard Skiles also testified that Shackelford had mentioned the possibility of there being a suicide victim: "I asked him what he thought the chances of there actually being a possible suicide in the fire and he said that he thought it could be good, but he didn't want to say because he didn't know for sure."

The record here shows that Shackelford's pre-trial comments did not alter any aspect of the criminal investigation. We are not excluding the possibility that a defendant could make statements during a criminal investigation that would create a theory of defense such that the State would find it necessary to offer evidence in their case-in-chief or as rebuttal during trial; however, that has not happened here. Therefore, we hold that the district court erred in allowing the State to introduce Donna's out-of-court statements to show that her state of mind was inconsistent with a defense theory of suicide.

Although we find that the district court erred in admitting the out-of-court statements of Donna, we hold that the error did not affect Shackelford's substantial rights. Whether an error affected substantial rights in a particular case depends upon a host of factors, including the importance of the witness' testimony to the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. *State v. Hooper*, 145 Idaho 139, 146, 176 P.3d 911, 918 (2007). In *State v. Garcia*, this Court found that, although the court erred in admitting hearsay testimony that was not based on any of the categories laid out in *Brown* and *Goodrich*, any inference of guilt from the victim's hearsay statements was outweighed by the defendant's own inculpatory admission made to the witness. 102 Idaho 378, 383, 630 P.2d 665, 670 (1981).

Similarly, in this case, any inference of Shackelford's guilt that may have stemmed from Donna's out-of-court statements was outweighed by testimony regarding Shackelford's own statements expressing his desire to kill Donna, along with the testimony of his co-conspirators and the forensic evidence regarding the murders and the arson. First, several witnesses testified as to statements Shackelford made regarding his desire to kill Donna. Donna's friend, Suzanne Ninichuck, testified as to two conversations she had with Shackelford in the summer of 1997:

A. [Shackelford] said that Donna was an ugly person and that he was going to destroy her. He was going to destroy her financially, he was going to destroy her professionally. That he was going to destroy her relationships with every friend and every family member and that—he said that she—oh, he said that she had abandoned him up on the mountain.

Q. What mountain?

A. The mountain by their Idaho property. And that she knew that was the worst thing that anybody could do to him was abandon him. And that she deserved—she deserved to die. She deserved to be ruined. . . .

9

He said that he—he loved her very much. He was—but he couldn't live with her. And that she—she was a controlling person, she manipulated people. That—he said he was going to kill her.

. . . .

And that he—at that point in time he said, he could kill her and make it look like an accident. And at that time he was driving a truck and he said he could just—he would—he could find her with the truck and kill her with the truck and he could make it look like an accident. . . .

He said if—he said he loved Donna very passionately and there was no other woman that he would ever love as much as Donna, but he couldn't live with her and if he couldn't live with her nobody would live with her.

James Avery, Donna's son, also testified that in the summer of 1997, he heard Shackelford say on two occasions that if Shackelford caught Donna with another man he would kill them both.[5]

In 1998, Shackelford began a relationship with Martha Millar when the two met while working as long-haul truckers. Millar testified that Shackelford convinced her that she should kill Donna for him:

Q. Ms. Millar, during these months of 1998 when you had this periodic contact with [Shackelford], did he tell you that his ex-wife, Donna, made his life miserable?

A. Yes.

Q. Did he tell you that he had to do away with her?

A. Yes.

Q. How many times did he say that?

A. I would say out of—one out of ten conversations, I would say about six or seven times.

Q. Alright. Did [Shackelford] tell you that you and he could not have a relationship as long as Donna was around?

A. Yes.

. . . .

---

[5] The first time Avery heard Shackelford make such a statement was in Idaho after Donna and Shackelford had an argument: "My mother and Dale had gotten into another fight. . . . And when I went outside I seen my mom walking down the road and I walked up by Dale and he was rambling. . . . He said similar things such as I don't know what I'm going to do. If I catch her with a guy again, I'm going to kill the mother f---ers." Avery also testified that about two weeks after that incident he saw Donna crying on her bed and Shackelford was pacing outside talking to himself: "And he was saying, I don't know what I'm going to do. If I catch with her [sic] another man maybe I should just kill them both."

10

Q. Alright. Did [Shackelford] express to you what would happen in your relationship if you did away with Donna Fontaine?

A. Yes.

Q. What did he say?

A. He said that I would be his forever.

Q. Alright. The—when [Shackelford] was talking to you about taking care of or doing away with Donna, what was your understanding of what he meant?

A. My understanding was that he wanted to put her six feet under.

Q. Wanted to kill her?

A. Yes.

After these conversations, Millar spoke to a friend and told her she had come up with an idea in response to Shackelford's request to "take care of Donna":

Q. What was your idea?

A. Oh, my idea was to cut her brake lines, dismantle, excuse me, her fuel line and put it near a spark plug so it would burst into flames.

Q. And did you talk to [Shackelford] about that idea?

A. Yes, I did.

Q. Did you and he discuss where he would be when you did this?

A. He would be far, far away.

Q. Why?

A. So that he would have an alibi.

Millar then began working for Shackelford Enterprises in September 1998, and the discussions about killing Donna continued:

Q. Alright. And did [Shackelford] talk to you more in August and September 1998 about Donna Fontaine?

A. Yes.

Q. What did he ask you to do?

A. He asks—he asked me if I could do away with her.

Q. Alright. And did he tell you what would happen if you did?

A. He would get me a lawyer and he would get me off.

. . . .

Q. In early October of 1998, did you have discussions with [Shackelford] about what you should do in Missouri with regard to Donna?

A. Yes.

Q. And what did he ask you to do?

A. He asked me to shoot her.

. . . .

Q. Can you tell us, as best you can recall, what [Shackelford] said to you during that conversation?

A. [Shackelford] told me that I should take my gun, put it in my fanny pack, go down to the courthouse, go directly up to her and shoot her. Empty my gun into her and just stand there like a crazy person.

Q. What did he tell you would happen after you stood there like a crazy person?

A. Well, the cop—the police were going to tackle me and I would get off on an insanity plea, which he would pay for the defense.

Q. When he told her to shoot her, did he use an analogy?

A. Shoot her like a dog.

Q. So then what happened on Monday, October 5th, 1998?

A. I asked Helen to drop me off in town. . . . She dropped me off by the courthouse, I walked up past Donna's office on the opposite side. I crossed the street and she came walking out of her office.

Q. Were you wearing your fanny pack?

A. Oh, yes.

Q. What was in it?

A. My gun.

. . . .

Q. Alright. What happened when she came out of her office?

A. She went to the courthouse. She went into the courthouse, she came back out. She went over to the post office. I followed her to the post office. She came out of the post office and I walked right past her, fanny pack opened, hand on the gun getting ready to pull it out and shoot her, walked right past her.

Q. Why?

A. Because I couldn't do it.

Millar further testified that in April 1999 Shackelford made a bomb to be used in another attempt on Donna's life:

Q. . . . When [Shackelford] talked to you on the telephone in April of 1999 about having made a bomb, what did he tell you?

12

A. He had told me that he had made a bomb and that he had asked Bernadette Lasater to take the bomb to the Caldonia, Missouri laundromat and she was to blow Donna.

Q. . . . did he tell you whether it worked or not?

A. He told me it had not.

The conversations between Millar and Shackelford regarding killing Donna continued:

Q. Alright. During the spring months of 1999, did [Shackelford] make any requests of you in regard to having anyone else kill Donna?

A. Yes.

. . . .

Q. What did he ask you?

A. He asked me if I knew anybody on the east coast, Connecticut to be exact, that's where I used to live, who would come out to Missouri and do away with Donna.

Q. What did you tell him?

A. I told him that I would think about it and that all my phone numbers were back at the office.

Finally, before Shackelford left for Idaho in late May 1999, Millar testified that he stated: "I'm going to Idaho and do what you couldn't do or what I couldn't get anybody to do."

Bernadette Lasater testified that she met Shackelford in December 1998 and began a romantic relationship with him in February 1999, at which point he also began talking to her about having Donna killed:

Q. As the relationship progressed in March and April of 1999, did [Shackelford] make any statements to you more specifically about—about what he wanted to happen with regard to his ex-wife?

A. He said he would want her to be killed because of—as long as she was alive, she would continually try to control his life. He would never be able to have a happy marriage or be happy, and if she was dead, he can have the happiness that he wanted.

. . . .

Q. Okay. And what did he say?

A. He said in order to prove my love to him that I would have—if I know anybody who would want to kill his wife—his ex-wife Donna.

. . . .

13

Before I done anything, we had a discussion, Dale and me and Mary Abitz and I believe Marty Millar was present, and there was going to be a preliminary hearing in—for Donna and he wanted her to be disposed of before then.

. . . .

He mentioned if any of us knew of anything that we could do to eliminate Donna and none of us could think of anything. And he came up with the idea of an ambush.

Q. What did he tell you about that?

A. He said there's a huge rock on the way to where Donna's cabin was and he would hide behind this rock with a shotgun and either I or one of the other women would drive my vehicle since she didn't know it or recognize it, and run her off the road. And after running her off the road into the ditch, he would shoot her.

Q. Did he tell you what he would shoot her with?

A. A shotgun.

In April 1999, Bernadette Lasater attempted to set off an explosive device that Shackelford created, at a laundromat in Missouri where Donna and her daughter were doing their laundry:

Q. Okay. Why did you go to the laundromat?

A. Dale said that Donna would be there.

. . . .

Q. What was your purpose in going to the laundromat?

A. To drop off the explosive and to detonate it.

. . . .

I drove back down into the driveway to the laundromat and pulled up by her truck.

. . . .

I unzipped the backpack, took out the bomb, and connected the detonator, it's a 9-volt battery to the side.

. . . .

Got out of my car, went into the laundromat, sat the explosive on a table next to a washing machine.

Q. Did you see anybody in the laundromat?

A. Yes.

Q. Who was that?

14

A. It was Donna and later on I found out it was her daughter, Shanna.

. . . .

Q. What did you do then?

A. I left the laundromat, got out—got back in my car, pulled out—started up and backed up a little ways, went down the driveway and stopped and pulled the wire of the remote he wired and pushed the button and nothing happened.

. . . .

Q. So what did you do then?

A. I tried it again and it still didn't happen and I told Dale nothing—I called him on the walkie-talkie and said nothing happened.  And he said to go on up to Ken's and turn around and I did and went back to go get the bomb and see if the wires came off or anything was wrong with it.

Q. And did Dale ask you to do that?

A. Yes.

. . . .

Q. And what did you do after it didn't work that [second] time?

A. I called Dale and told him it didn't work and he said don't worry about it, just to go and get it.

A friend of Bernadette Lasater, Bobby Emily, also testified that Shackelford had asked him to kill Donna:  "And I told him that I had to do something to make some money.  And he says if you want to make some real money, he says, you can get rid of my wife for me."  Shackelford also asked Helen Hays, an employee and woman he was having a relationship with, if she would be willing to kill Donna for him:

Q. What did he ask you?

A. He asked me if I would get rid of Donna for him.

Q. Did he offer to give you anything for that?

A. He offered me $5,000 to get rid of her.

. . . .

He asked me if I couldn't do it, if I knew anybody that might do it.

Finally, witnesses testified that Shackelford made comments around the time of the deaths of Donna and Fred indicating that he had committed the murders.  PJ Baker, a neighbor to the Abitzes and friend of Shackelford, testified that the following conversation took place between he and Shackelford on the evening preceding the murders:

15

A. [M]y first comment to him was, why are you driving at night with no lights.

Q. What was his response?

A. His response was, I don't want anybody to know I'm here, only Sonja knows.

. . . .

Q. What did he talk about?

A. I just made mention of—I don't know if I said where's Donna or how is Donna or what, but he said—he looked up at the ceiling and said, Donna is no more.

. . . .

Q. Okay. Did he talk to you at all that evening about or use the word alibi?

A. Uh-huh. Yeah, that's right. He came in and wanted an alibi that—for me to say that he had had lunch with Katie and myself.

. . . .

Q. Okay. Now, did he talk anything else that was upsetting?

A. Yes. He said—he asked me the question if I had two bodies to get rid of, how would I do it.

Katherine Baker, PJ Baker's wife, also testified that, on the day of the fire, Shackelford came to their house and asked her what they had for lunch, and then stated "don't worry, you won't be hurt by any of this."

In light of the extensive testimony of the State's witnesses, as well as evidence regarding the times of the deaths, the manner in which the victims were shot, the setting of the fire, and further testimony regarding Shackelford's actions on the day of the deaths, Shackelford has failed to establish beyond a reasonable doubt that the error associated with the admission of testimony regarding Donna's fear would have changed the outcome of the verdict. Therefore, we hold that the error was harmless because Shackelford's substantial rights were not affected.

**c. The district court erred in admitting Sonja Abitz's statements, but that error was harmless.**

Shackelford next argues that the district court erred in admitting the out-of-court statements made by Sonja Abitz. He contends that the court erred in admitting Sonja's statements to Dorothy Cox because, at the time the statements were made, a conspiracy had not been formed, and because the statements, on their face, were not made in furtherance of the

16

conspiracy. We find that the district court abused its discretion in admitting the testimony regarding Sonja's statements pursuant to I.R.E. 801(d)(2)(E), but that error was harmless.

Idaho Rule of Evidence 801(d)(2)(E) states: "A statement is not hearsay if—the statement is offered against a party and is . . . a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." "Statements are considered in furtherance of a conspiracy when the statements tend to advance or promote the object of the conspiracy, as opposed to thwarting its purpose." 29 Am. Jur. 2d *Evidence* § 856 (2009). The statements "must somehow advance the objectives of the conspiracy, not merely inform the listener of the declarant's activities." *United States v. Snider,* 720 F.2d 985, 992 (8th Cir. 1983). In *State v. Caudill*, this Court held that, where the statements were made after the crime had been committed, the statements were not made in furtherance of the conspiracy because the co-conspirator was not "attempting to further conceal the crime or to obstruct justice." 109 Idaho 222, 226, 706 P.2d 456, 460 (1985).

During the trial, Dorothy Cox testified that Sonja told her "we're going to burn her house down."[6] Judy Foster also testified that Sonja stated that "she wished that [Donna] would just leave, that her house would just burn down and she would go back to Missouri." These statements in no way advanced or promoted the object of the conspiracy, nor did they attempt to conceal the crime. Instead, these statements merely informed the listeners that Sonja disliked Donna and wanted to burn her house down so that Donna would leave Idaho. If anything, these statements may have thwarted the purpose of the conspiracy because Sonja was announcing to non-conspirators potentially incriminating evidence. Thus, the district court erred in admitting

---

[6] The following questioning of Dorothy Cox took place:
  Q. Did she in this period of time that we're talking in the spring of 1999 at the bus garage, did she express her dislike for Donna Fontaine?
  A. Yes.
    . . . .
  Q. Okay. And what did Sonja Abitz say to you about Donna Fontaine?
    . . . .
  A. She told me she was going to burn her house down.
  Q. Okay. Was she angry when she was saying this?
  A. Yes.
  Q. What was her demeanor?
  A. She was angry.
  Q. Did she state at that time why her house was going to be burned down by her?
  A. No.
  Q. Did she—what were the words that you can recall that she said about this?
  A. She said we're going to burn her house down.

17

the out-of-court statements of Sonja Abitz because they were not in furtherance of any conspiracy. However, we find such error to be harmless based upon Shackelford's own statements expressing his desire to kill Donna, the testimony of his co-conspirators, and the forensic evidence concerning the deaths and the arson discussed above. Shackelford failed to establish beyond a reasonable doubt that the error associated with the admission of the testimony regarding Sonja's statements affected the outcome of the verdict.

### d. The statements of Mary Abitz and Robin Eckmann were properly admitted.

Shackelford next asserts that the court erred in admitting Mary Abitz's statements to law enforcement officers because the statements were clearly testimonial and thus Shackelford's Sixth Amendment right to confront witnesses against him was violated by their admission. Shackelford also contends that the admission of the statements of Robin Eckmann violated his Sixth Amendment rights. The statements at issue were introduced through the testimony of Sergeant Earl Aston, and revolved around a phone conversation Sergeant Aston had with Mary Abitz while he was at Shackelford's place of business in Missouri.[7] We find that the district court did not abuse its discretion in admitting the testimony regarding statements made by Mary

---

[7] The following portion of the transcript is relevant to the issues of the admission of the out-of-court statements of both Mary Abitz and Robin Eckmann:

Q. Detective Aston, during this phone call with Mary Abitz, was she asked about a tape—the tape?
A. Yes, she was.
Q. Okay. And what happens as she's asked about the tape, *what is the defendant's demeanor at that time?*
A. Are we talking about the first tape she was asked about or the second tape?
Q. She's asked about a tape *and what happens to the defendant's demeanor* when she's asked about that?
   The Court: I think the witness has asked you to clarify which tape.
Q. It's the tape as she—who asks her about the tape?
A. I'm not sure if it was me or Robin. I believe, it was Robin Eckmann who had asked her about the tape.
Q. Okay. And what—did Robin ask about which particular tape it was?
A. I don't believe at first. I think she was just asked if she had received a tape or was going to be receiving a tape—if she knew she was going to be receiving a tape, I believe was the question.
Q. Okay. And what did—*what did the defendant do at this time?*
   Mr. Baker: Your Honor, I'd object on the basis of hearsay as to what Robin Eckmann may have said. There's not going to be, as I understand, a chance to cross examine Ms. Eckmann.
   Mr. Christensen: Your Honor, that's just a question, it's not an assertion.
   The Court: Overruled.
Q. *What happens to the defendant at this time,* what's his manner?
A. Mary started explaining that she had or that Becky had received a tape. And I noticed that *Mr. Shackelford, to me it appeared, that he was agitated, becoming agitated.* He started rocking back in his chair and drawing—he was smoking a cigarette at the time and drawing hard on a cigarette. It was just a difference in his demeanor at that point and . . . .

(Emphasis added.)

18

and Eckmann because the statements were non-testimonial in nature and the district court instructed the jury that the statements were not offered for the truth of the matter asserted.

When a violation of a constitutional right is asserted, this Court will give deference to the trial court's factual findings unless those findings are clearly erroneous. *State v. Hooper*, 145 Idaho 139, 142, 176 P.3d 911, 914 (2007). However, we exercise free review over the trial court's determination as to whether constitutional requirements have been satisfied in light of the facts found. *Id.* Whether the admission of Mary's and Eckmann's statements violated Shackelford's right to confront witnesses under the Sixth Amendment is a question of law over which the Court exercises free review.

The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Davis v. Washington*, 547 U.S. 813, 821 (2006). Only testimonial statements cause the declarant to be a "witness" within the meaning of the Confrontation Clause. *Id.* The determination of whether evidence is testimonial requires the court to consider the purpose behind the Confrontation Clause. *State v. Hooper*, 145 Idaho 139, 143, 176 P.3d 911, 915 (2007). The Supreme Court based its holding in *Crawford v. Washington,* 541 U.S. 36 (2004), on the historical underpinnings of the Confrontation Clause, and noted that the Sixth Amendment must be interpreted with this history in mind: "First, the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Hooper*, 145 Idaho at 143, 176 P.3d at 915 (quoting *Crawford*, 541 U.S. at 50).

In *Hooper*, this Court analyzed the guidelines set forth by the Supreme Court in *Crawford* in determining what constitutes testimonial statements:

> First, the Court looked to Webster's dictionary definition of "testimony" from 1828. Testimony is "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford,* 541 U.S. at 51, (quoting 1 N. Webster, An American Dictionary of the English Language (1828)). The Court then listed three formulations of "core" testimonial statements:
>
> > (1) "*ex parte* in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;"

19

(2) "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;" and

(3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Crawford,* 541 U.S. at 51-52, (internal citations omitted). This is not an exclusive list of "testimonial" evidence. Rather, these formulations all share a "common nucleus" and then define the Clause's coverage at various levels of abstraction around it. *Id.*

*Id*. at 142-43, 176 P.3d at 914-15. This Court in *Hooper* then analyzed the factual situations of both *Crawford* and *Davis,* and determined that, under those cases, a statement is testimonial when:

[T]he circumstances objectively indicate that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution, unless made in the course of police interrogation under circumstances objectively indicating the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.

*Id.* at 143-44, 176 P.3d at 915-16. This Court also discussed the Supreme Court's focus on the formality of questioning and the extent to which the interview was similar to live testimony. *Id*. at 144-45, 176 P.3d at 916-17. In *Davis,* the Supreme Court stated: "Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial." 547 U.S. 813, 830 (2006). Taking such factors into account, this Court employs a totality of the circumstances analysis to determine whether statements are testimonial in nature. *Hooper*, 145 Idaho at 145, 176 P.3d at 917.

Looking at the totality of the circumstances here, it is apparent that the statements were non-testimonial in nature. Shackelford told Sergeant Aston that Martha Millar had taped an argument between Shackelford and Bernadette Lasater and mailed the tape to Mary Abitz. Mary then called Shackelford, and he put her on speaker phone in the room he was sitting in with Sergeant Aston. Mary's statements themselves were not offered for the purpose of establishing or proving some fact. Nor was the primary purpose of the questioning to establish or prove past events. Instead, Sergeant Aston's testimony focused on Shackelford's demeanor during the conversation. Therefore, we find that the district court did not err in admitting the out-of-court statements of Mary Abitz.

The district court also overruled defense counsel's objection to the introduction of Robin Eckmann's out-of-court statements during Sergeant Aston's testimony regarding the conversation with Mary about the tape. We agree with the State that the statements were offered merely to provide context to Mary's answer.

## 2. Jury instructions

Shackelford argues that the district court erred in giving, or failing to give, certain jury instructions, which served to lessen the State's burden of proof and permitted less than unanimous verdicts. The State contends that, reading the jury instructions as a whole, Shackelford has failed to establish that the instructions given by the district court violated his constitutional rights.

### a. Standard of Review

"Whether jury instructions fairly and adequately present the issues and state the applicable law is a question of law over which this Court exercises free review." *State v. Humpherys*, 134 Idaho 657, 659, 8 P.3d 652, 654 (2000). Therefore, the correctness of a jury instruction depends on whether there is evidence at trial to support the instruction. *Craig Johnson Constr., L.L.C. v. Floyd Town Architects, P.A.,* 142 Idaho 797, 800, 134 P.3d 648, 651 (2006). We look at the jury instructions as a whole, not individually, to determine whether the jury was properly and adequately instructed. *Obendorf v. Terra Hug Spray Co.*, 145 Idaho 892, 896, 188 P.3d 834, 838 (2008). An erroneous instruction will not constitute reversible error unless the instructions as a whole misled the jury or prejudiced a party. *Kuhn v. Proctor*, 141 Idaho 459, 462, 111 P.3d 144, 147 (2005).

### b. The district court did not err in refusing to give a *Holder* instruction.

Shackelford first argues that the district court's failure to give a *Holder* instruction to the jury constitutes reversible error because Shackelford should have been allowed an instruction that correctly defined the proper use of circumstantial evidence, as the State's case was based entirely on circumstantial evidence. He contends that the court's refusal to give the jury a *Holder* instruction violated the *Ex Post Facto* and Due Process Clauses of the Idaho and United States Constitutions. [8]

---

[8] In *Marks v. United States*, 430 U.S. 188, 191-92 (1977), the United States Supreme Court stated:

> The Ex Post Facto Clause is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government. But the principle on which the Clause is

In *State v. Holder*, 100 Idaho 129, 132, 594 P.2d 639, 642 (1979), this Court held that when the prosecution's evidence is entirely circumstantial, the defendant is entitled to a special instruction limiting the effects of the evidence. The instruction that was requested in that case, and that the Court found to be a proper statement of the law was as follows:

> You are not permitted to find the defendant guilty of the crime charged against him based on circumstantial evidence unless the proved circumstances are not only consistent with the theory that the defendant is guilty of the crime, but cannot be reconciled with any other rational conclusion and each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt has been proved beyond a reasonable doubt.

*Id*. This Court's holding in *Holder* led to the rule that "in cases where guilt is proven by circumstantial evidence, that evidence must be sufficient to exclude every reasonable hypothesis other than the guilt of the defendant." *State v. Humpherys*, 134 Idaho 657, 660, 8 P.3d 652, 655 (2000) (quoting *State v. Randles*, 117 Idaho 344, 350, 787 P.2d 1152, 1158 (1990)). The basis for the Court's holding in *Holder* was the concern that circumstantial evidence was inherently unreliable and could be the basis for convicting an innocent defendant. *Humpherys*, 134 Idaho at 660, 8 P.3d at 655.

However, in *Humpherys*, this Court overruled *Holder* and held that "once the jury has been properly instructed on the reasonable doubt standard of proof, the defendant is not entitled to an additional instruction on circumstantial evidence even when all the evidence is circumstantial." 134 Idaho at 661-62, 8 P.3d at 656-57. The Court cited to a Supreme Court of West Virginia case in support of having only one standard of proof in criminal cases:

> Circumstantial evidence and direct evidence inherently possess the same probative value. In some instances certain facts can only be established by circumstantial evidence. Hence, we can discern no reason to continue the requirement that circumstantial evidence must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt. We agree with those courts that have held that an additional instruction on the sufficiency of circumstantial evidence invites confusion and is unwarranted. Since circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt. Nothing more should be required of a factfinder.

based the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties is fundamental to our concept of constitutional liberty. As such, that right is protected against judicial action by the Due Process Clause of the Fifth Amendment.
(Citations omitted).

*Id.* at 661, 8 P.3d at 656 (quoting *State v. Guthrie*, 461 S.E.2d 163, 175 (W.Va. 1995)). Therefore, Idaho law no longer recognizes a distinction between direct and circumstantial evidence for the purposes of jury instructions.

The district court based its denial of Shackelford's request for a *Holder* instruction on this Court's decision in *Humpherys*. Shackelford argues that the district court's reliance on *Humpherys* violated his constitutional rights by applying an *ex post facto* law. *Ex post facto* laws are prohibited by article I, section 9, clause 3 of the United States Constitution and by article I, section 16 of the Idaho Constitution. The *ex post facto* prohibition forbids Congress and the States from enacting any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Weaver v. Graham*, 450 U.S. 24, 28 (1981) (quoting *Cummings v. Missouri*, 71 U.S. 277, 325-26 (1866)). In accordance with these purposes, two critical elements must be present for a criminal or penal law to be *ex post facto*: (1) it must be retrospective, that is, it must apply to events occurring before its enactment, and (2) it must disadvantage the offender affected by it. *Weaver*, 450 U.S. at 29.

However, if the change is merely procedural, "and does 'not increase the punishment nor change the ingredients of the offense or the ultimate facts necessary to establish guilt,'" there is no *ex post facto* violation. *Id.* at 29 n.12 (quoting *Hopt v. Utah,* 110 U.S. 574, 590 (1884)). "[T]he constitutional provision was intended to secure substantial personal rights against arbitrary and oppressive legislation and not to limit the legislative control of remedies and modes of procedure which do not affect matters of substance." *Beazell v. Ohio*, 269 U.S. 167, 171 (1925). The Supreme Court in *Collins v. Youngblood* stated that "procedural" can be thought to refer to "changes in the procedures by which a criminal case is adjudicated, as opposed to changes in the substantive law of crimes." 497 U.S. 37, 45 (1990).

We find that the district court did not err in refusing to give a *Holder* instruction here because the change was procedural. *Humpherys* did not change the "substantive law of crimes" but instead recognized that direct and circumstantial evidence possess the same probative value and thus the reasonable doubt standard is applicable to both. It simply clarified that one standard of proof applies to all types of evidence. Shackelford did not have to present any more or any less evidence because the jury would be giving the same weight to the evidence. In addition, counsel for Shackelford did not object to the specific language in Jury Instruction 4 that stated

"[t]he law makes no distinction between direct and circumstantial evidence as to the degree of proof required. . . ." Therefore, we find that the district court did not err in failing to give the *Holder* instruction.

### c. The jury instructions on the conspiracy counts were proper.

Shackelford asserts that the jury instructions on the conspiracy counts are ambiguous and thus permitted the jury to return a non-unanimous verdict on proof less than beyond a reasonable doubt, violating his right to due process. The State contends that, because Shackelford was found guilty of the underlying offenses of first-degree murder and first-degree arson, which were both alleged as overt acts, the jury necessarily unanimously found at least one overt act sufficient to establish the conspiracy counts. In the alternative, the State argues that a unanimity instruction was not necessary.

In all felony cases, the jury's verdict must be unanimous; however, a specific unanimity instruction is not always necessary. *State v. Johnson*, 145 Idaho 970, 977, 188 P.3d 912, 919 (2008); Idaho Const. art. I, § 7. In *Johnson*, the appellant relied on a line of cases from the Idaho Court of Appeals that hold that "[a] specific unanimity instruction is required . . . when it appears . . . that a conviction may occur as the result of different jurors concluding that the defendant committed different acts." *Id*. (quoting *State v. Gain*, 140 Idaho 170, 172, 90 P.3d 920, 922 (Ct. App. 2004)). The Court found those cases to not be applicable, however, because in *Johnson* there was not "evidence of more criminal acts than have been charged." *Johnson*, 145 Idaho at 977, 188 P.3d at 919 (quoting *State v. Montoya*, 140 Idaho 160, 167, 90 P.3d 910, 917 (Ct. App. 2004)).

*Johnson* also cited to *Schad v. Arizona*, 501 U.S. 624 (1991), a United States Supreme Court opinion that found that a specific unanimity instruction was not necessary. The district court in *Schad* instructed the jury that "[f]irst degree murder is murder which is the result of premeditation.... Murder which is committed in the attempt to commit robbery is also first degree murder." *Id*. at 629. The defendant in *Schad* challenged his first-degree murder conviction, arguing that the jury was not instructed to unanimously agree on the alternative theories of premeditated and felony murder. *Id*. at 630. The Supreme Court plurality found the following:

> Petitioner's jury was unanimous in deciding that the State had proved what, under state law, it had to prove: that petitioner murdered either with premeditation or in the course of committing a robbery. . . . We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single

means of commission, any more than the indictments were required to specify one alone. In these cases, as in litigation generally, "different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict."

*Id.* at 630-32 (quoting *McKoy v. North Carolina,* 494 U.S. 433, 449 (1990) (Blackmun, J., concurring)). The primary concern is that the defendant understands "with some specificity the legal basis of the charge against him." *Schad*, 501 U.S. at 632-33.

Here we find that the jury instructions were proper because unanimity as to each of the preliminary factual issues was not necessary. The jury instruction on conspiracy to commit first-degree murder stated:

In order for the defendant to be guilty of Conspiracy to Commit First Degree Murder in Count IV, the state must prove each of the following:

  1. On or about 25th to 29th days of May, 1999

  2. In the state of Idaho, County of Latah

  3. the defendant, Dale Carter Shackelford, and Mary Margaret Abitz and Sonja Marie Abitz agreed

  4. to commit the crime of Murder in the First Degree

  5. the defendant intended that the crime would be committed

  6. one of the parties to the agreement performed at least one of the following acts:

     A. Dale Carter Shackelford threatened to kill Donna Fontaine.

     B. Dale Carter Shackelford hid his presence from Donna Fontaine, Gary Fontaine, and Ted Meske.

     C. Dale Carter Shackelford went to Donna Fontaine's residence at 2168 Three Bear Road.

     D. Dale Carter Shackelford shot Donna Fontaine with a shotgun and pistol, killing her.

  7. Such act was done for the purpose of carrying out the agreement.

If any of the above has not been proven beyond a reasonable doubt, then you must find the defendant not guilty. If each of the above has been proven beyond a reasonable doubt, you must find the defendant guilty.

Second, the district court gave the instruction explaining the elements for conspiracy to commit first-degree arson as follows:

In order for the defendant to be guilty of Conspiracy to Commit Arson in the First Degree in Count V, the state must prove each of the following:

1. On or about the 25th to 29th days of May, 1999

2. in the county of Latah

3. in the state of Idaho

4. the defendant, Dale Carter Shackelford, and Mary Margaret Abitz and Sonja Marie Abitz agreed

5. to commit the crime of Arson in the First Degree (as explained in instructions No. 19 and No. 20)

6. the defendant intended that the crime would be committed

7. one of the parties to the agreement performed at least one of the following acts:

   A. Dale Carter Shackelford hid his presence from Donna Fontaine, Gary Fontaine, and Ted Meske;

   B. Dale Carter Shackelford went to Donna Fontaine's residence at 2168 Three Bear Road;

   C. Dale Carter Shackelford poured flammable liquid in the garage at that location;

   D. Dale Carter Shackelford lit fires in both stories of the garage

8. such act was done for the purpose of carrying out the agreement.

If any of the above has not been proven beyond a reasonable doubt, then you must find the defendant not guilty of Conspiracy to Commit Arson in the First Degree. If each of the above has been proven beyond a reasonable doubt, you must find the defendant guilty of Conspiracy to Commit Arson in the First Degree.

The jurors were also generally instructed that they were to return unanimous verdicts: "In this case, your verdicts must be unanimous. . . . Your verdicts in this case cannot be arrived at by chance, by lot, or by compromise."

It is the section of each instruction that requires the jury to find "one of the parties to the agreement performed at least one of the following acts" that Shackelford contends violated his right to due process by not requiring the jury make a unanimous finding. However, under *Schad* and *Johnson*, such a finding was not necessary. The jurors here agreed upon the "bottom line": One of the parties performed *at least* one of the acts, and it was not necessary for the jury to reach unanimity on the underlying factual issues, so long as they unanimously decided on the verdict. Therefore, the jury instructions did not violate Shackelford's right to due process.

26

**d. The jury instructions on arson were proper.**

Shackelford asserts that Jury Instructions 18 and 19 were ambiguous and misled and confused the jury, as evidenced in the jury's note to the judge, and the failure to correct this ambiguity resulted in a verdict that was not based upon proof beyond a reasonable doubt of the crime of arson as charged in Count III of the Indictment. The State argues that Shackelford failed to establish jury confusion regarding the elements of first-degree arson and that, because Instruction 19 generally followed the elements of I.C. § 18-801 and 802, Shackelford has failed to establish error.

Idaho Code § 18-801 offers definitions for the crime of arson, such as "damage" and "dwelling." Idaho Code § 18-802 provides that "[a]ny person who willfully and unlawfully, by fire or explosion, damages: (1) Any dwelling, whether occupied or not . . . is guilty of arson in the first degree." Instruction 18 given by the district court reads:

> The Defendant, DALE CARTER SHACKELFORD, in COUNT III is charged with the crime of ARSON IN THE FIRST DEGREE alleged to have been committed as follows:
>
> COUNT III
>
> That the Defendant, DALE CARTER SHACKELFORD, on or about the 29th day of May, 1999, in the County of Latah, State of Idaho, did willfully and unlawfully, by fire or explosion, damage a dwelling, to-wit: a garage with upstairs living quarters located at 2168 Three Bear Road, by pouring a flammable liquid in the building and lighting a fire on both stories.
>
> To such charge the Defendant has pleaded not guilty.

Instruction 19 reads:

> In order for the defendant to be guilty of Arson in the First Degree, the State must prove each of the following:
>
> 1. On or about the 29th day of May, 1999
> 2. in the county of Latah
> 3. state of Idaho
> 4. the defendant, Dale Carter Shackelford, willfully
> 5. by fire or explosion
> 6. damaged
> 7. a dwelling, whether occupied or not.
>
> If you find any of the above have not been proven beyond a reasonable doubt, you must find the defendant not guilty. If each of the above has been proven beyond a

27

reasonable doubt, you must decide the defendant is guilty of Arson in the First Degree.

The instruction further provided definitions, and Instruction 20 advised the jurors of the distinction between first and second degree arson.  Instructions 25 and 26 dealt with the conspiracy to commit arson charges.

The district court received the following question from the jury:  "Regarding instruction number 25, 26 number 18, clarification: Must it be determined that the fire was lit on both stories before it can be determined arson?  Or that the defendant can be found guilty of arson as in number 18?"  After conferencing with the parties, the court responded:

> Ladies and gentlemen, instructions numbered 18 and 25 state the charges of arson in the first degree and conspiracy to commit arson in the first degree, which are contained in the indictment.

> Instructions 19 and 26 contain the elements that are necessary for the State to prove beyond a reasonable doubt for the defendant to be found guilty of arson in the first degree and conspiracy to commit arson in the first degree.  You will need to review the elements instructions, instruction numbers 19 and 26, to determine the answer to your questions.

We find the jury instructions were not misleading and the court did not err in thus instructing the jury.  Jury Instruction 19 stated the applicable law as found in I.C. § 18-802 and there was evidence at trial to support the instructions.  Thus, the instructions were proper as they did not mislead the jury or prejudice Shackelford.

### e.  The district court did not err in instructing the jury regarding accomplice liability.

Shackelford asserts that the district court erred in reading Instruction 33 to the jury, setting forth a theory of accomplice liability, because there was no language charging Shackelford with aiding and abetting in the Indictment and thus there was nothing to put Shackelford on notice to prepare a defense to these charges.  He also argues that the instruction was ambiguous because none of the instructions regarding his participation in the murders of Donna and Fred, the arson, or the preparing of false evidence directed the jury to find that he had aided and abetted any of the crimes.  The State counters that Instruction 33 was proper because Idaho has abolished all distinctions between principals and aiders and abetters.

Idaho Code § 19-1430 provides:

> **Distinction between accessories and principals abolished**—The distinction between an accessory before the fact and a principal and between principals in the first and second degree, in cases of felony, is abrogated; and all persons

28

concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, shall hereafter be prosecuted, tried, and punished as principals, and no other facts need be alleged in any indictment against such an accessory than are required in an indictment against his principal.

Thus, Idaho, consistent with many other jurisdictions, has abolished the distinction between principals and aiders and abettors, and instead treats aiding and abetting as a theory under which first-degree murder can be proved—not as a separate offense or a crime of a different nature. *State v. Johnson*, 145 Idaho 970, 973, 188 P.3d 912, 915 (2008). In *Johnson*, this Court found that "it is unnecessary to instruct the jury that it must be unanimous as to the theoretical basis for committing the offense (aider and abettor or principal) because aiding and abetting is not a separate offense from the substantive crime." *Id*. at 978, 188 P.3d at 920.

Instruction 33 states:

The law makes no distinction between a person who directly participates in the acts constituting a crime and a person who, either before or during its commission, intentionally aids, assists, facilitates, promotes, encourages, counsels, solicits, invites, helps or hires another to commit a crime with intent to promote or assist in its commission. Both can be found guilty of the crime. Mere presence at, acquiescence in, or silent consent to, the planning or commission of a crime is not sufficient to make one an accomplice.

We find that this instruction stated the applicable law as laid out in I.C. § 19-1430 and *Johnson*. The instruction did not mislead the jury or fail to put Shackelford on notice of the charge because I.C. § 19-1430 allows an aider and abetter to be charged as a principal and "no other facts need be alleged in any indictment" because the distinction between the two is abrogated.

**f. The jury instruction on preparing false evidence was proper.**

Shackelford next contends that Instruction 30 is ambiguous because the word "produced" is never defined, which makes it impossible to know whether the jury agreed that produced meant to actually make the tape or whether it meant to give the tape to someone or bring it to someone's attention. The State contends that the instruction was not ambiguous because "produced" is a term of common usage that did not need further definition and because Shackelford failed to support the claim with any citation to authority.

Instruction 30 reads:

In order for the defendant to be guilty of Preparing False Evidence, the State must prove each of the following:

1. During a period of time between August, 1999, and January 24, 2000

29

2. in the state of Idaho

3. the defendant, Dale Carter Shackelford, willfully prepared false evidence

4. with the intent to produce it, or allow it to be produced, for any fraudulent or deceitful purpose, as genuine or true

5 at a grand jury proceeding in Latah County which was authorized by law.

If you find any of the above have not been proven beyond a reasonable doubt, you must find the defendant not guilty of Preparing False Evidence. If each of the above has been proven beyond a reasonable doubt, you must find the defendant is guilty of Preparing False Evidence.

We find that the term "produced" was not ambiguous in the jury instruction. The jury instruction itself answers the question of what the term "produced" meant because it provides that the evidence was produced "at a grand jury proceeding." Thus, Shackelford's argument that "produced" may have meant actually making the tape or giving the tape to someone or bringing it to someone's attention is invalid because the evidence had to be produced as genuine or true at the actual grand jury proceeding. There is nothing ambiguous about the jury instruction when read in its entirety. Therefore, we find that the jury was properly and adequately instructed.

### 3. Post-Conviction Issues

Shackelford raises a number of post-conviction issues dealing with the effectiveness of his counsel during the guilt phase of his trial, as well as a *Brady* claim. He maintains that the district court erred in summarily dismissing his claims that he was deprived the right to counsel of choice, and that his counsel was ineffective due to lack of qualifications, in impeaching State's witnesses, and in preparing defense expert witnesses.

### a. Standard of Review

An application for post-conviction relief under the Uniform Post Conviction Procedure Act (UPCPA) is civil in nature. *Workman v. State*, 144 Idaho 518, 522, 164 P.3d 798, 802 (2007). The applicant for post-conviction relief must prove by a preponderance of evidence the allegations upon which the application for post-conviction relief is based. *Id.* Unlike the complaint in an ordinary civil action, however, an application for post-conviction relief must contain more than "a short and plain statement of the claim" that would suffice for a complaint under I.R.C.P. 8(a)(1). *Id.* Rather, an application for post-conviction relief must be verified with respect to facts within the personal knowledge of the applicant. *Id.* "The application must

present or be accompanied by admissible evidence supporting its allegations, or the application will be subject to dismissal." *State v. Payne*, 146 Idaho 548, 561, 199 P.3d 123, 136 (2008); *see also* I.C. § 19-4903.

### b. The district court did not err in denying Shackelford's *Brady* claim.

Shackelford asserts that the State failed to disclose material that would have undermined the testimony of Dr. Robert Cihak in the form of peer review notes provided by Dr. John Howard. The State contends that Shackelford failed to establish that the State was required to disclose Dr. Howard's notes or that the notes would have resulted in a different verdict.

The United States Supreme Court held in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Subsequent to *Brady*, the Supreme Court expanded the duty to include volunteering exculpatory evidence never requested, or requested only in a general way. *United States v. Bagley*, 473 U.S. 667, 682 (1985). However, the prosecution need volunteer evidence only when suppression of the evidence would be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *United States v. Agurs*, 427 U.S. 97, 108 (1976). Showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more. *Kyles v. Whitley*, 514 U.S 419, 437 (1995).

To prove a *Brady* violation, three components must be shown: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Thus, a new trial is not automatically required whenever "'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . . .'" *Giglio v. United States*, 405 U.S. 150, 154 (1972). Instead, the Supreme Court has held that regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different." *Kyles*, 514 U.S at 433 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A "reasonable probability" of a different result is accordingly shown when the government's evidentiary

31

suppression "undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678).

Dr. Cihak testified regarding his "guesstimate" that, based on his examination of the contents of Fred's stomach, Fred had eaten "probably several hours before he—within several hours of his death." There are many factors that affect digestion, and Dr. Cihak offered that "one can never be exact because one doesn't know at the time of autopsy what was going on necessarily from the time that victim has eaten." He also explained that determining how long contents had been in the stomach was "a very controversial area. And there are people that feel some factors either speed or delay, and other people will take the opposite. This is a very, let us say, not scientifically identified area." Dr. Cihak also testified that his findings had been "peer review[ed]." In his post-conviction claims, Shackelford contended that the State withheld exculpatory evidence by failing to disclose the peer review notes of Dr. John Howard. However, as the district court found below, Shackelford was provided with the notes of Dr. Howard but was not provided with the abstracts that accompanied the notes, which consisted of several scientific articles questioning the validity of determining a victim's time of death based upon stomach content. As the court pointed out, the abstracts came from medical journals that were generally available and did not contradict Dr. Cihak's testimony that he could offer only a "guesstimate" of the time of death.

On appeal, Shackelford's only statement regarding the notes of Dr. Howard is as follows: "The State failed to disclose material which would have undermined the testimony of Dr. Cihak. This evidence consists of peer review notes provided by Dr. John Howard concerning Dr. Cihak's 'guesstimate' of the time of death based on stomach contents." Shackelford argues nothing about how the abstracts or the notes would have undermined the testimony, nor how he was prejudiced by any failure to disclose the notes. Furthermore, we find that there was no prejudice because Dr. Cihak himself testified that determining time of death based on stomach contents was a "controversial" and "not scientifically identified" area. We find that the district court did not err in denying Shackelford's *Brady* claim because he has not shown the reasonable probability of a different result.

**c. Shackelford was not deprived of his right to counsel of choice.**

Shackelford argues that because the Latah County Sheriff's Department seized nearly $5,000 in cash from him, he could not afford to hire a lawyer. He contends in his brief on appeal

that he solicited at least four private criminal defense lawyers for representation, including James Siebe, and testified that the $5,000 could have covered the expense of hiring an attorney for his initial appearance. Shackelford asserts that the failure to allow him to choose his own counsel violates his qualified right to choice of counsel and constitutes prejudicial error per se.

The State maintains that Shackelford failed to establish that $5,000 would have retained an attorney to represent him in a capital double murder case and therefore this claim fails. The State also argues that Shackelford has not challenged the district court's findings, particularly with regard to his "evasiveness," and that the $5,000 would have been insufficient to do more than retain counsel for the "initial proceedings." In addition, Shackelford presented no evidence that he had assets close to the $500,000 trial counsel were paid to represent Shackelford.

The Sixth Amendment guarantees defendants in criminal cases the right to adequate representation and to a qualified right to choice of counsel, but "those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." *Caplin & Drysdale, Chartered v. U.S.*, 491 U.S. 617, 624 (1989). "[A] defendant may not insist on representation by an attorney he cannot afford." *Id*. (quoting *Wheat v. United States*, 486 U.S. 153, 159 (1988)). However, where the right to choice of counsel is wrongly denied by a court, it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation. *U.S. v. Gonzalez-Lopez*, 548 U.S 140, 148 (2006). Instead, "[d]eprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received." *Id*.

We find that the district court did not err in appointing counsel to represent Shackelford because Shackelford did not demonstrate that he had the means to hire his own lawyer, nor did he ever request specific counsel of choice. During Shackelford's initial appearance on February 14, 2000, the court asked Shackelford if he would like to be considered for appointment of counsel at the public's expense, to which Shackelford replied that he would. The court then gave Shackelford a form to fill out regarding his financial ability. Shackelford repeatedly avoided

filling out the form, arguing that he did not have the information he needed to fill it out. He did receive a letter from James Siebe on March 7, 2000,[9] which stated:

> I am very much disturbed about the manner in which the prosecutor has deprived you of your assets when it came time for hiring a lawyer; notwithstanding the potential for succeeding in your lawsuit (which may very well take as much as those funds are worth) and trying to obtain a release of the same, it does not appear that the sum total of those amounts would be sufficient to hire an attorney for representation in a capital murder case. On the other hand, had you had this money available to you at the time of your arrest I am not so certain I would not have been able to take the case had I a belief that the court would appoint a second chair counsel to assist me in that endeavor.

However, it is unclear if the "assets" Mr. Siebe is referring to is the $5,000 or a different amount that he had been offered by Shackelford, and his statement that he may have been able to take the case was dependant on the court's appointment of a co-counsel. Furthermore, he stated that the money available would not have been enough to hire an attorney for representation. This is consistent with Shackelford's own statement during his initial appearance: "So, again, I have talked with counsel James Siebe and a Mr. Walker, both which have described to me that a case of this magnitude is going to take at least $100,000. I can just about guarantee I don't have that much in my canteen account, Your Honor."

> The district court made the following findings and conclusions on this issue:

> The Petitioner was given several opportunities during the early stages of his case to show he had the wherewithal to hire an attorney during his criminal proceedings. He was unable to do so. He also engaged in evasiveness to a degree never before or since witnessed by this Court. The Petitioner has not, and cannot, allege that the $5,000 seized would have been sufficient to finance his defense to capital murder. Such a claim is absurd. The Petitioner's trial counsel, . . . were jointly paid over $500,000 to represent the Petitioner through his sentencing. Arguing that $5,000, one-hundredth of the amount spent, would have been sufficient to secure representation on a case of this magnitude is ludicrous. The Petitioner was not deprived of the right to counsel of his choice.

We agree, and find that Shackelford was not deprived of his right to counsel of choice.

### d. Shackelford was not deprived of effective assistance of counsel.

Claims for ineffective assistance of counsel are reviewed utilizing the two-prong test set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). *See Mitchell v. State*, 132 Idaho 274,

---

[9] The appointment of counsel occurred on February 15, 2000, and this letter from March 7, 2000, was submitted during Shackelford's post-conviction proceedings as evidence on this issue. Therefore, there is no evidence that the letter was presented during the pre-trial proceedings as part of an effort on Shackelford's part to choose counsel.

34

277, 971 P.2d 727, 730 (1998). To prevail on such a claim, the applicant for post-conviction relief must demonstrate (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's errors, the result would have been different. *Strickland*, 466 U.S. at 687-88, 692; *Mitchell*, 132 Idaho at 277, 971 P.2d at 730. When evaluating an ineffective assistance of counsel claim, this Court does not second-guess strategic and tactical decisions, and such decisions cannot serve as a basis for post-conviction relief unless the decision is shown to have resulted from inadequate preparation, ignorance of the relevant law, or other shortcomings capable of objective review. *Pratt v. State*, 134 Idaho 581, 584, 6 P.3d 831, 834 (2000).

"There is a 'strong presumption that counsel's performance fell within the wide range of professional assistance.'" *State v. Hairston*, 133 Idaho 496, 511, 988 P.2d 1170, 1185 (1999) (quoting *Aragon v. State*, 114 Idaho 758, 760, 760 P.2d 1174, 1176 (1988)). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. The burden is on the defendant to show a "reasonable probability" that the result would have been different. *Wong v. Belmontes,* 130 S.Ct. 383, 390 (2009). A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland,* 466 U.S. at 697; *see also Belmontes,* 130 S.Ct. at 386.

The State argues that Shackelford has failed to support his claims of ineffective assistance of counsel with any authority or argument; thus, they are waived. While Shackelford has cited to very little authority in support of his arguments, we will still address each of his arguments.

### i. Deprivation of effective assistance of counsel due to lack of qualifications

Shackelford first contends that his right to effective assistance of counsel was violated because Ray Barker was not on the Idaho Supreme Court roster of attorneys qualified for appointment as lead counsel in death penalty cases pursuant to Idaho Criminal Rule 44.3. The State counters that the district court held a hearing regarding Barker's qualifications and

expressly noted that I.C.R. 44.3 had been suspended,[10] which Shackelford did not dispute. In addition, the court found "Mr. Barker qualifies by experience to be lead counsel," as permitted under I.C.R. 44.3(8).[11]

However, I.C.R. 44.3(8) did not exist until the rule was amended and became effective March 15, 2001. Instead, when Shackelford was appointed counsel, the rule existed in a form very similar to what it is today, just without sub-section 8. *See* I.C.R. 44.3 (2000). In *State v. Hairston*, 133 Idaho 496, 988 P.2d 1170 (1999), this Court addressed qualifications of counsel in capital cases without relying on I.C.R. 44.3. In *Hairston*, the defendant alleged ineffective assistance of counsel because neither of his attorneys representing him had any prior trial experience in capital cases. *Hairston*, 133 Idaho at 511, 988 P.2d at 1185. The Court found his argument unpersuasive and stated: "Counsel was not ineffective solely because of inexperience in capital trials. The constitution does not establish a minimum level of experience for the appointment of counsel in a death penalty case." *Id.*

While I.C.R. 44.3 was in effect at the time Shackelford was appointed counsel on February 15, 2000, Shackelford has failed to demonstrate how the appointment of counsel not listed on the Idaho Supreme Court roster pursuant to the rule automatically resulted in ineffective assistance of counsel. He simply argues that Mr. Barker was not on the roster and his lack of qualifications contributed to violations of Shackelford's right to effective assistance of counsel. The district court evaluated Mr. Barker's qualifications and expressly found that he was qualified based upon the standards for qualification laid out in I.C.R. 44.3:

> I do make a finding that even though Rule 44.3 has been suspended by the Idaho Supreme Court that Mr. Barker qualifies by experience to be lead counsel. I also make a finding that Mr. Mahaffy qualifies as co-counsel under the rule that has been suspended. And I do conclude that Mr. Barker and Mr. Mahaffy provide adequate representation for Mr. Shackelford in a capital case.

---

[10] However, the history of the rule shows that it was amended and effective as of February 15, 2000, when counsel was appointed for Shackelford.

[11] Idaho Criminal Rule 44.3(8) states:

> Notwithstanding the requirement of this rule that all appointments shall be from the court-maintained rosters, if an appointment of counsel from the rosters cannot practically and expeditiously be made, the appointing court may appoint one or more counsel who are not on the roster but who otherwise meet the qualifications set out in this rule.

I.C.R. 44.3 (2008).

We find that Shackelford has not demonstrated that counsel's performance fell below an objective standard of reasonableness or that he was in anyway prejudiced by counsel not being on the Idaho Supreme Court roster.

### ii. Impeaching State's witnesses

Shackelford next argues that counsel failed to adequately impeach PJ Baker and Katherine Baker. He contends that trial counsel did not know about PJ's significant criminal record, other than a felony conviction related to a bombing, and a reasonably competent attorney would have vigorously impeached PJ on these matters. He asserts that had a more vigorous impeachment been conducted, the jury would not have believed PJ's testimony and the result of his trial would have been different. Shackelford contends that his trial counsel failed to adequately impeach Katherine because there were inconsistencies in her testimony that went unnoticed by counsel and thus by the jury. Again, he asserts that a more vigorous impeachment of Katherine would have weakened PJ's testimony and led the jury to not believe PJ.

The State asserts that Shackelford has failed to explain how further impeachment of these two witnesses would have changed the outcome of his trial. The State explains that the jury was aware that PJ was a convicted felon and that the State had granted him immunity as concerned PJ's charge of handling of a firearm by a convicted felon. The State further contends that Shackelford's claim regarding Katherine fails because he has not demonstrated prejudice and counsel's actions were reasonable.

As was expressed in *Strickland v. Washington,* 466 U.S. 668 (1984), we need not address whether counsel's performance in impeaching the Bakers was deficient before examining whether Shackelford demonstrated that he was prejudiced as a result of the alleged deficiencies. *Strickland*, 466 U.S. at 697. Shackelford has argued that the jury would not have believed the testimony of PJ and the outcome of the trial would have been different. However, he offers no explanation as to how the outcome would have differed and why the jury would not have believed PJ. In addition, the jury was aware that PJ was a convicted felon and that he had been granted immunity by the State. Shackelford has not shown how the evidence of any other crimes committed by PJ, even assuming they were admissible pursuant to I.R.E. 609, would have otherwise altered the jury's opinion of PJ. Furthermore, Shackelford failed to demonstrate how counsel's impeachment of Katherine prejudiced him. Thus, we find Shackelford's counsel were not ineffective in their impeachment of the State's witnesses as Shackelford has not

demonstrated that "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

### iii. Preparing defense expert witnesses

Shackelford next contends that his counsel were ineffective in preparing their arson expert, Don Perkins, and their ballistics expert, Kay Sweeney. He asserts that counsel did not have Perkins investigate the fire scene until the evening before his testimony, review any crime scene photographs until the day of his testimony, or speak to trial counsel about his testimony until just hours before he testified. Because Perkins was not adequately prepared, his testimony was not helpful in rebutting the State's fire expert. In addition, Shackelford contends that trial counsel failed to supply Sweeney with the necessary foundational support for his opinion that the State's theory regarding the location of the shooter and the victims was not valid; therefore, the exhibit supporting the testimony was rejected and the force of Sweeney's testimony undermined.

The State counters that Shackelford's allegations that Perkins was not adequately prepared were based upon pure speculation, and that Shackelford failed to establish any benefit that would have been gained from providing Perkins with additional material or preparation. In addition, Shackelford failed to provide any evidence of how, if Perkins had been better prepared, that additional preparation would have affected the outcome of the trial. Finally, the State argues that, at best, Sweeney's exhibit was merely cumulative evidence, which would not have changed the outcome of Shackelford's trial.

Perkins testified that he viewed the following to prepare for his trial testimony:

> The documents you [defense counsel] provided me include the following: A copy of the Deary Fire Department incident report, a copy of the Lewiston fire report and the investigation report. You provided me a copy of Mr. Don Howard's report, you also provided me testimony, the courtroom testimony, of Mr. Howard. You provided me with the report from Mr. Lauper, the Idaho State Fire Marshall, and his report and also his testimony.

> You've also provided me with some photographs of the fire scene taken by investigators. And you've also provided me with some additional written statements, written by Gary Fontaine and Ted Meske on the evening of this incident. I also had the opportunity to visit the fire scene late yesterday afternoon. . . . I shoveled off the whole pad so that I could physically see the burn patterns and the materials that were left that's been shown me in the photographs provided.

38

Perkins testified that the fact that he had started reviewing documents in the middle of November had not impacted his opinion because he "had ample time to review the documents." There was no recross-examination of Perkins that demonstrated any problems with him not having time to prepare other than questions about the physical scene. Perkins was able to review all of the pictures offered by the State and he reviewed the State's experts' investigations and reports. Shackelford does not indicate how he was prejudiced so "that the trial cannot be relied on as having produced a just result" because of counsel's preparation of Perkins. *Strickland*, 466 U.S. at 686. Perkins testified that he was adequately prepared and Shackelford has not shown a reasonable probability that the result would have been different had Perkins been more prepared. Therefore, we find that Shackelford was not prejudiced by any deficiencies in counsel's preparation of Perkins.

Similarly, Shackelford has not demonstrated that he was prejudiced or that the outcome of the trial would have been any different had trial counsel adequately prepared Sweeney. He contends that if the exhibit had been provided, the jury would have known that the State's theory was flawed, but Sweeney testified to this matter and the exhibit was simply offered for illustrative purposes. Shackelford again has shown no reasonable probability that the result would have differed if the exhibit had been allowed. Therefore, we find that Shackelford's right to effective assistance of counsel was not violated, and the district court did not err in summarily dismissing his claim for post-conviction relief.

### 4. Cumulative error did not deprive Shackelford of a fair trial.

Shackelford argues that the accumulation of irregularities aggregated to show the absence of a fair trial. Therefore, he asserts, the cumulative error doctrine requires a reversal of the conviction as the trial contravened his right to due process. Under the cumulative error doctrine, "an accumulation of irregularities, each of which might be harmless in itself, may in the aggregate reveal the absence of a fair trial in contravention of the defendant's right to due process." *State v. Severson*, 147 Idaho 694, ___, 215 P.3d 414, 443 (2009) (quoting *State v. Martinez*, 125 Idaho 445, 453, 872 P.2d 708, 716 (1994)). The presence of errors alone, however, does not require the reversal of a conviction. *State v. Moore*, 131 Idaho 814, 823, 965 P.2d 174, 183 (1998). The cumulative effect of the errors we have noted, when viewed in relation to the totality of the evidence presented at trial, did not deprive Shackelford of a fair trial.

## B.  Sentencing Phase

The State has cross-appealed the district court's grant of post-conviction relief under *Ring v. Arizona*, 536 U.S. 584 (2002), which set aside Shackelford's death sentences for resentencing by a jury.  The State argues that, because the weighing of mitigating factors under I.C. § 19-2515(c) does not increase the penalty from life to death, but actually reduces the penalty from death to life, the weighing process is not the functional equivalent of an element of a greater offense and, therefore, the jury was not mandated to complete the weighing process in Shackelford's case.  In addition, the State argues that since the jury's first-degree murder verdicts established that Shackelford murdered Donna and Fred at the same location and date, it follows that the jury found the multiple murder aggravator of I.C. § 19-2515(h)(2) (2000) beyond a reasonable doubt.

Shackelford contends that his death sentence is unconstitutional under *Ring* because the jury did not make the findings of fact that made Shackelford eligible for the sentence of death.  He argues that the jury could not have found the aggravating circumstance under I.C. § 19-2515(h)(2) because the jury did not take part in Shackelford's sentencing proceedings and the guilt-phase verdict is not sufficient to conclude that the jury would have found the statutory aggravating circumstances beyond a reasonable doubt.  Alternatively, Shackelford argues that even if this Court finds that the district judge could permissibly infer the requisite finding of the statutory aggravator in this case, the district court's vacation of Shackelford's death sentence must be affirmed because the jury did not weigh the aggravator against the mitigating circumstances.

Both Shackelford and the State agree that *Ring v. Arizona* applies because the Supreme Court released the decision in *Ring* during the time the direct review of this case was pending. *See Griffith v. Kentucky*, 479 U.S. 314, 323 (1987).  The district court found that Shackelford's death sentence should be set aside because a jury, not a judge, must weigh the mitigating factors against the aggravating factors.  The court did not agree with Shackelford's contention, however, that the jury did not find any of the aggravating factors.  Instead, the district court found that the jury's verdicts for first-degree murder of both Donna and Fred established the existence of multiple murders and thus found the statutory aggravator beyond a reasonable doubt pursuant to I.C. §19-2515(h)(2).  Specifically, the court stated:  "[T]he jury found the Petitioner guilty of the first degree murders of both Donna Fontaine and Fred Palahniuk at the same location and on the

same date. Those verdicts, standing alone, appear to establish the existence of multiple murders which constitutes a statutory aggravator beyond a reasonable doubt."

The jury here found Shackelford guilty of the first-degree murder of both Donna and Fred by general verdict, which respectively read: "As to the charge of First Degree Murder of Donna Fontaine [Fred Palahniuk], we, the Jury in the above entitled cause, find the defendant: Guilty." The verdicts for the murders of both Donna and Fred were based on jury instructions that instructed the jury to find beyond a reasonable doubt that "the killing occurred in Latah County, and in the State of Idaho" and that "the killing occurred on or about the 29th day of May, 1999." The district court's finding of aggravating factors in its original imposition of the death sentences was based on both I.C. § 19-2515(h)(2) (2000) and I.C. § 19-2515(h)(10) (2000), in the case of Donna, and I.C. § 19-2515(h)(2), in the case of Fred. In its Findings of the Court in Considering Death Penalty, the district court found, as to Donna's murder, that the State had proven beyond a reasonable doubt two statutory aggravating factors, including: (1) at the time the murder was committed the defendant also committed another murder, I.C. § 19-2515(h)(2), and (2) the murder was committed against a witness or potential witness in a criminal or civil proceeding because of such proceeding, I.C. § 19-2515(h)(10). As to Fred's murder, the court found beyond a reasonable doubt one statutory aggravating factor, that at the time the murder was committed the defendant also committed another murder, I.C. § 19-2515(h)(2).

The Sixth Amendment entitles capital defendants "to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring,* 536 U.S. at 589. The effect of *Ring* was to convert statutory aggravating circumstances relevant to sentencing into "the functional equivalent of an element of a greater offense," which must be proved to a jury beyond a reasonable doubt. *Id.* at 606-09; *Apprendi v. New Jersey*, 530 U.S. 466, 482-84 (2000). Thus, *Ring* rendered unconstitutional the sentencing scheme of I.C. § 19-2515 (2001), which required the trial judge to make the factual findings regarding the existence of aggravating circumstances. *State v. Lovelace* (*Lovelace I*), 140 Idaho 53, 66-67, 90 P.3d 278, 291-92 (2003). "This Court must first resolve whether the error is harmless beyond a reasonable doubt where the statutory aggravating factors, which render a defendant death eligible, were neither included in the instructions to the jury nor proven beyond a reasonable doubt." *State v. Lovelace (Lovelace II)*, 140 Idaho 73, 79, 90 P.3d 298, 304 (2004). This Court will find

harmless error under such circumstances only if no reasonable jury could find that the State failed to prove the aggravating factors beyond a reasonable doubt. *Id.*

Based in part on the reasoning presented in a line of Alabama cases,[12] the State maintains that verdicts produced at the guilt stage of a trial can show that the jury found a defendant guilty of aggravating factors. These findings by the jury in this instance, the State argues, meet the criteria for the multiple-murder aggravator, I.C. § 19-2515(h)(2). A similar argument was advanced by the State in *Lovelace II*. There, Lovelace had been found guilty of first-degree murder and first-degree kidnapping. *Lovelace I*, 140 Idaho at 59, 90 P.3d at 284. However, the State argued that because the jury had found Lovelace guilty of kidnapping, it was harmless error that the trial court did not include the statutory aggravating factors in the instructions to the jury. *Lovelace II*, 140 Idaho at 79, 90 P.3d at 304. This Court noted that the State was "asking the Court to determine what the jury would have found had it been presented with instructions defining [the statutory aggravating factors that were] to be applied to the facts surrounding the murder." *Id.*

To engage in appellate hindsight on this issue, such as that advanced by the State, is constitutionally infirm. First, it violates the jury-trial guarantee for a court to "hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support the verdict might be[.]" *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). Next, the Sixth Amendment "requires more than appellate speculation about a hypothetical jury's action." *Id.* at 280. Moreover, to accept the State's argument would be to look at the form of the jury verdict, rather than the effect of using it to sentence Shackelford to death. *Ring* instructs that this cannot be done. 536 U.S. at 604. Rather, when presented with this same argument by Arizona—that the defendant had been found guilty of a crime which could also serve as an aggravating factor— the Supreme Court noted that this argument overlooks the relevant inquiry of effect, rather than form. *Id.* Instead, if "a State makes an increase in a defendant's authorized punishment contingent on the finding of fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Id.* at 602. Therefore, a "defendant may not be exposed to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Id.* at 602 (quoting *Apprendi*, 530 U.S. at 483) (alterations removed).

---

[12] The cases include *Turner v. State*, 924 S.2d 737 (Ala. Crim. App. 2002); *Irvin v. State*, 940 S.2d 331 (Ala. Crim. App. 2005); and *Tomlin v. State*, 909 So.2d 213 (Ala. Crim. App. 2002).

42

In this case, the charge to the jury on first-degree murder for both Donna and Fred had elements including that the killing occurred in Latah County and on or about May 29, 1999. The verdict form reads simply: "As to the charge of First Degree Murder of Donna Fontaine [Fred Palahniuk], we, the Jury in the above entitled cause, find the defendant: Guilty." There was no finding by this jury that, at the same time one murder was committed, the defendant committed another murder.

Therefore, we affirm the district court's decision vacating Shackelford's sentence and its determination that Shackelford must be resentenced by a jury under *Ring* because we cannot find beyond a reasonable doubt that a reasonable jury could find that the State proved that Donna and Fred were killed at the same time. Without analyzing whether *Ring* requires a jury to weigh mitigating factors, this Court finds that the jury was required to find the aggravator, and such a finding was not explicit in the first-degree murder verdicts.

## III. CONCLUSION

We affirm the district court on all issues. We affirm on the order for resentencing on different grounds and remand for a sentencing hearing pursuant to § 19-2515 (2008).

Chief Justice EISMANN and Justices J. JONES, W. JONES and HORTON, **CONCUR.**