# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 40301

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | Boise, August 2014 Term |
| Plaintiff-Respondent, | ) | |
| | ) | 2015 Opinion No. 36 |
| v. | ) | |
| | ) | Filed: April 1, 2015 |
| KATHERINE LEA STANFIELD, | ) | |
| | ) | Stephen Kenyon, Clerk |
| Defendant-Appellant. | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Ronald J. Wilper, District Judge.

The judgment of conviction is affirmed.

Sara B. Thomas, State Appellate Public Defender, Boise, for appellant. Brian R. Dickson argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent. Russell J. Spencer argued.

_____

HORTON, Justice.

Katherine Lea Stanfield appeals from her judgment of conviction, entered following a jury trial, for the first-degree murder of two year-old W.F. by aggravated battery on a child under twelve years. Stanfield raises two primary challenges on appeal. First, she alleges that the district court erred in admitting certain expert testimony, claiming that its admission violated her Sixth Amendment right to confrontation and that the evidence was inadmissible hearsay. Second, she contends that the district court deprived her of her Fourteenth Amendment right to due process and right to a jury trial by failing to properly instruct the jury. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On December 11, 2009, at 3:35 p.m., Ada County Sheriff's dispatch received an emergency call from Stanfield requesting medical assistance for W.F., the son of her daughter's boyfriend. At the time, Stanfield operated a daycare primarily for her two grandsons and W.F., and she had been watching W.F. most weekdays during the previous four months. Stanfield told

1

dispatchers that W.F. was unresponsive after falling and hitting his head. A medical unit arrived at the scene at 3:40 p.m. and transported W.F. to St. Luke's Regional Medical Center.

W.F. was treated by several doctors and underwent a number of tests, including two CT scans, which indicated severe head trauma. W.F. did not regain consciousness and died on December 13, 2009. An autopsy was performed on W.F. which revealed axonal injury to his brain. According to Dr. Charles Garrison, the pathologist who performed W.F.'s autopsy, this injury could have been caused by either hypoxia or trauma. Dr. Garrison requested that a neuropathologist become involved in order to ascertain the cause of the axonal injury. Dr. Garrison preserved W.F.'s brain for this examination. Based on Dr. Garrison's evaluation of all of the other evidence, but prior to receiving the neuropathologist's report, he concluded that W.F.'s death was caused by non-accidental trauma.

Police questioned Stanfield and her two grandsons, C.D. (age 8) and J.D. (age 5), about the incident immediately after W.F. was transported to the hospital and several times in the months following W.F.'s death. On September 21, 2010, Stanfield was charged with first-degree murder by aggravated battery on a child under twelve. Stanfield maintained that W.F. was not pushed or shaken, but had fallen down while she was in the kitchen and he was alone in the living room. The interviews of C.D. and J.D. corroborated Stanfield's version of events, but multiple medical experts concluded that W.F.'s injuries were inconsistent with this scenario. After charging Stanfield, in order to help resolve the conflicting theories, the State hired Dr. Lucy Rorke-Adams, a neuropathologist, to examine W.F.'s brain tissue to determine the cause of his death.

The trial began on May 2, 2012, with the jury returning its verdict on June 4, 2012. The primary issue at trial was what—or who—caused the injuries that resulted in W.F.'s death. The State contended that W.F. died from non-accidental head trauma resulting from Stanfield abusing him. Stanfield denied that W.F. was abused and asserted that he hit his head after falling and his injuries were caused by a combination of the fall and other medical conditions, including hypoxia caused by the emergency responders.

At trial, seven medical experts testified for the prosecution and three testified for the defense. In addition to these experts, Dr. Rorke-Adams testified for the State regarding her examination of W.F.'s brain tissue and the conclusions she drew from that examination. Dr. Rorke-Adams testified that, while she personally conducted the examination and wrote the

2

report, she did not participate in preparing the slides that she examined; rather, her technician prepared the slides.[1] After verifying the technician's work by reference to a control slide, Dr. Rorke-Adams evaluated the slides and wrote a report detailing her findings and conclusions.

Stanfield objected, arguing that because Dr. Rorke-Adams lacked personal knowledge of the technician's actions, Dr. Rorke-Adams' testimony violated her right to confrontation and was impermissible hearsay. The district court overruled Stanfield's objections and permitted Dr. Rorke-Adams to testify that the slides she examined contained W.F.'s brain tissue and that, based on her examination of the slides, she believed that W.F. died from non-accidental head trauma resulting from abuse.

Without objection, the district court instructed the jurors that to find Stanfield guilty of first-degree murder, they must find that she committed aggravated battery on W.F., which resulted in his death, but that they were not required to find that she intended to kill. After deliberating for thirteen hours, the jury found Stanfield guilty of first-degree murder. The district court sentenced Stanfield to life in prison, with ten years fixed.

Stanfield appeals the district court's decision to permit Dr. Rorke-Adams to testify as to the results of her examination and the cause of W.F.'s axonal injuries. Stanfield also challenges the district court's jury instruction, alleging that it constitutes fundamental error in violation of her Fourteenth Amendment right to due process and her right to a jury trial.

## II. STANDARD OF REVIEW

When a violation of a constitutional right is asserted, we will defer to the trial court's factual findings unless those findings are clearly erroneous. *State v. Hooper*, 145 Idaho 139, 142, 176 P.3d 911, 914 (2007). This Court exercises "free review over the trial court's determination as to whether constitutional requirements have been satisfied in light of the facts found." *Id*. Whether admission of evidence violates a defendant's right to confront adverse witnesses under the Sixth Amendment's Confrontation Clause is a question of law over which this Court exercises free review. *Id*. Likewise, "[t]he issue of whether a particular jury instruction is necessary and whether the jury has been properly instructed is a matter of law over which this Court exercises free review." *State v. Adamcik*, 152 Idaho 445, 472, 272 P.3d 417, 444 (2012).

---

[1] As part of her examination, Dr. Rorke-Adams testified that she cut "slices" of W.F.'s brain. She gave those slices to a technician, who transferred the tissue to slides, labeled the slides, applied the stain that Dr. Rorke-Adams specified, and returned the slides to Dr. Rorke-Adams for her examination.

The trial court has broad discretion in deciding whether to admit hearsay evidence under one of the exceptions, and this Court will not overturn an exercise of that discretion absent a clear showing of abuse. *State Dep't of Health & Welfare, ex rel. Osborn v. Altman*, 122 Idaho 1004, 1007, 842 P.2d 683, 686 (1992). Whether the district court has abused its discretion is determined by examining: "(1) whether the court correctly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of its discretion and consistently within the applicable legal standards; and (3) whether the court reached its decision by an exercise of reason." *State v. Shackelford*, 150 Idaho 355, 363, 247 P.3d 582, 590 (2010). Even if evidence was admitted in error, this Court will not grant relief if we find the error to be harmless. *Id.*; *see also* I.C.R. 52.

## III. ANALYSIS

We first consider whether the district court erred by permitting the introduction of Dr. Rorke-Adams' testimony. This requires a determination whether the introduction of her testimony abridged Stanfield's Sixth Amendment right of confrontation. We then separately consider whether Dr. Rorke-Adams' testimony included inadmissible hearsay. Finally, we address Stanfield's challenge to the jury instruction.

**A. The district court did not err by admitting Dr. Rorke-Adams' testimony.**

1. The admission of the testimony did not violate Stanfield's Sixth Amendment right of confrontation.

As previously noted, the district court overruled Stanfield's objection and permitted Dr. Rorke-Adams to testify that the slides she examined contained W.F.'s brain tissue and as to the findings and conclusions she reached based upon her examination of those slides. Dr. Rorke-Adams did not personally prepare the slides that she examined; rather, a technician in her lab purportedly prepared the slides in accordance with instructions from Dr. Rorke-Adams. Stanfield contends that the technician, by labeling the slides, asserted that they contained W.F.'s tissue, and that, by returning the slides to Dr. Rorke-Adams without any notations, asserted that the proper chemicals had been applied to the tissue samples in accordance with her instructions. Stanfield argues that these assertions are testimonial and that Dr. Rorke-Adams introduced them for their truth. Thus, Stanfield contends that the Confrontation Clause required that the State produce the testimony of the laboratory technician in addition to that of Dr. Rorke-Adams. Absent this testimony, Stanfield argues, Dr. Rorke-Adams' opinions and conclusions were not relevant or reliable and should not have been presented to the jury.

4

### a. Current Confrontation Clause jurisprudence

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with witnesses against him." U.S. Const. amend. VI; *see also* Idaho Const. Art. I § 13. The right to confrontation is fundamental and applies equally to state prosecutions. *Pointer v. Texas*, 380 U.S. 400, 403 (1965). Our state constitution does not contain a confrontation clause similar to that found in the United States Constitution; therefore, this issue is analyzed solely under the United States Constitution. *State v. Sharp*, 101 Idaho 498, 502, 616 P.2d 1034, 1038 (1980).

The Confrontation Clause only "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' " *Crawford v. Washington*, 541 U.S. 36, 51 (2004). The United States Supreme Court has determined that this language restricts the Confrontation Clause to testimonial hearsay. *Davis v. Washington*, 547 U.S. 813, 823–24 (2006); *Crawford*, 541 U.S. at 51. The Confrontation Clause only applies to statements that are "testimonial." *Davis*, 547 U.S. at 823; *Crawford*, 541 U.S. at 51. The Clause does not bar statements not offered to prove the truth of the matter asserted. *Crawford*, 541 U.S. at 59 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)). If the statement is testimonial, then its admission is permitted only if the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 59; *Hooper*, 145 Idaho at 143, 176 P.3d at 915.

Any declaration, affirmation, omission, or nonverbal conduct made for the purpose of establishing some fact, qualifies as a statement. The Supreme Court has recognized that affirmations made by way of omissions may constitute statements. *Bullcoming v. New Mexico*, 131 S.Ct. 2705, 2714 (2011) ("He further represented, by leaving the '[r]emarks' section of the report blank, that no 'circumstance or condition . . . affect[ed] the integrity of the sample or . . . the validity of the analysis.' "). In this case, the technician's labeling and the omission of any indication that Dr. Rorke-Adams' instructions had not been followed constitute statements for Confrontation Clause purposes. However, these statements must be testimonial for the Confrontation Clause to apply.

The Supreme Court has not provided a comprehensive definition of "testimonial," but some guiding principles may be gleaned from that Court's recent decisions. Whether a statement is testimonial is determined by looking at the statement's primary purpose and its similarities to

traditional testimony. *Davis*, 547 U.S. at 822. Testimony is defined as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51 (alteration in original; citation omitted). Therefore, a statement is testimonial when "the circumstances objectively indicate that . . . the primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822. When no such primary purpose exists, the statement is nontestimonial and its admissibility is governed by state and federal rules of evidence, not the Confrontation Clause.[2] *Michigan v. Bryant*, 562 U.S. 344, ___, 131 S.Ct. 1143, 1155 (2011).

Further, while a statement does not have to be written or made under oath to be testimonial, the formality of the statement itself and the formality of the circumstances in which the statement is made are relevant to determine whether it was intended to establish some fact at trial. *Davis*, 547 U.S. at 826, 827–28; *see, e.g., Shackelford*, 150 Idaho at 373, 247 P.3d at 600 (the totality of the circumstances analysis considers "the formality of questioning and the extent to which the interview was similar to live testimony"). In essence, a statement is testimonial when it is intended to be "a weaker substitute for live testimony at trial." *Davis*, 547 U.S. at 828 (internal quotation, citation omitted). While this definition has been easily applied to traditional testimony presented by lay witnesses, its application to forensic evidence and expert testimony has proved to be problematic.

Three Supreme Court cases have addressed the subject presented in this case—whether the statements contained in, or relied on in creating, forensic reports are "testimonial"—but these decisions are difficult to distill into controlling principles of law. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009); *Bullcoming*, 131 S.Ct. 2705; *Williams v. Illinois*, 132 S.Ct. 2221 (2012). It is clear that a statement—forensic or otherwise—is testimonial if it is made primarily with an evidentiary purpose, regardless of its formality or any other particular criteria. *Bryant*, 131 S.Ct. at 1155; *see also Melendez-Diaz*, 557 U.S. at 324. Justices Scalia, Ginsburg, Stevens, and Souter, (and eventually Justices Sotomayor and Kagan) have consistently voted together, opining that this is the only requirement for a statement to be testimonial. *See e.g. Melendez-Diaz*, 557 U.S. at 310. Justices Kennedy, Breyer, Alito, and Chief Justice Roberts, also

---

[2] The rules of evidence may assist in determining the purpose of a statement. For example, "[b]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009).

consistently voting together, have considered whether the statement has an accusatory aspect. Justice Thomas has focused on the formality of the statement. *See*, *e.g., id*. at 343–44 (Kennedy, J., dissenting); *Id*. at 329–30 (Thomas, J., concurring). Given the present evolution of the Supreme Court's Confrontation Clause jurisprudence, it is appropriate to more carefully examine these decisions.

The United States Supreme Court first took up the issue of whether analysts' statements contained in forensic reports are testimonial for Confrontation Clause purposes in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305. There, the trial court admitted three "certificates of analysis" that cocaine was present in bags of powder seized from the defendant. *Id*. at 308. The certificates were sworn to before a notary by the analysts who conducted the testing. *Id*. The plurality held that the certificates were testimonial because they were "solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact" and were "quite plainly affidavits." *Id*. at 310 (quoting *Crawford*, 541 U.S. at 51). The Court noted that the governing statute provided that "the *sole purpose* of the affidavits was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance," *id*. at 311 (emphasis in original, internal quotation and citation omitted), and that the certificates provided "the precise testimony the analysts would be expected to provide if at trial." *Id*.[3]

Despite this holding, the plurality explained that:

> [W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case . . . but, what testimony *is* introduced must (if the defendant objects) be introduced live.

*Id*. at 311 n.1 (emphasis in original). Justice Thomas concurred, resulting in a 5-4 holding that the Confrontation Clause was violated by admission of the certificates. Justice Thomas reasoned that, because the certificates were "formalized testimonial materials" and "quite plainly affidavits," they were governed by the Confrontation Clause. *Id*. at 329–30 (Thomas, J., concurring). Justice Kennedy, joined by Justices Roberts, Breyer, and Alito, dissented, arguing that the Sixth Amendment's use of the phrase "witnesses against" requires that the witness

---

[3] The plurality also looked to the rules of evidence to determine if the statements served an evidentiary purpose. *Melendez-Diaz*, 557 U.S. at 321–22. Although the certificates of analysis were records created in the ordinary course of the laboratory's business, their purpose was not for the administration of the laboratory's affairs but rather to establish or prove some fact at trial. *Id*. at 324. Therefore, although falling within the well-established business records exception, because their primary purpose was evidentiary, the analysts were subject to confrontation. *Id*.

perceive "an event that gives him personal knowledge of some aspect of the defendant's guilt." *Id.* at 343–44 (Kennedy, J., dissenting). The dissent reasoned that "[t]he analyst's distance from the crime and the defendant, in both space and time, suggests the analyst is not a witness against the defendant in the conventional sense." *Id.* at 345.

Two years later, the Court again addressed the issue in *Bullcoming v. New Mexico*, 131 S.Ct. 2705. In *Bullcoming*, the State introduced the results of a blood alcohol test as the principal evidence in the defendant's prosecution for driving while intoxicated. *Id.* at 2709–10. The "certificate of analyst" was signed by the testing analyst and reported that the defendant's blood alcohol concentration was .21. *Id.* at 2710. Additionally, the analyst affirmed that he had "received Bullcoming's blood sample intact with the seal unbroken, that he checked to make sure that the forensic report number and the sample number 'corresponded,' and that he performed on Bullcoming's sample a particular test, adhering to a precise protocol." *Id.* at 2714. The trial court allowed the certificate to be admitted as a business record during the testimony of another analyst who was employed by the same laboratory. *Id.* at 2712. Although the testifying analyst was familiar with the lab's routine procedures, he had neither observed nor reviewed the certifying analyst's findings. *Id.*

On appeal, the majority concluded that the report was indistinguishable from the report admitted in *Melendez-Diaz*, despite not being sworn to under oath, and was thus testimonial. *Id.* at 2717. They explained that "[a] document created solely for an 'evidentiary purpose,' . . . made in aid of a police investigation, ranks as testimonial." *Id.* (citing *Melendez-Diaz*, 129 S.Ct at 2532). In addition to affirming *Melendez-Diaz*, the *Bullcoming* majority further explained that the Confrontation Clause required that the statements not only had to be admitted through live testimony, but that the testimony had to be that of the specific analyst who conducted the scientific test at issue. *Id.* at 2715. The Court rejected the notion that "surrogate testimony" could satisfy the requirements of the Confrontation Clause because only the analyst responsible for the testing could "convey what [he] knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process he employed." *Id.* The Court held that the Confrontation Clause does not permit a person to testify to the observations made by another, regardless of whether they were recorded, simply because the person testifying is familiar with the technology the observing witness used. *Id.* at 2714–15.

8

Of particular significance to our decision today, Justice Sotomayor's concurrence discussed the limited scope of the holding, emphasizing that the decision did not extend to situations, such as the one presently before this Court, in which the "expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence." *Id*. at 2722 (Sotomayor, J., concurring).

The overriding principle that we glean from *Melendez-Diaz* and *Bullcoming* is that introduction of reports by non-testifying analysts violates the defendant's right of confrontation when they are "for the purpose of establishing or proving some fact at trial," *Melendez-Diaz*, 557 U.S. at 324, or are "affirmation[s] made for the purpose of establishing or proving some fact in a criminal proceeding." *Bullcoming*, 131 S.Ct. at 2716 (alteration in original; internal quotation omitted). In the present case, the challenged evidence served as foundation for the introduction of Dr. Rorke-Adams' testimony rather than direct evidence of a fact pointing toward Stanfield's guilt. Thus, we do not view these decisions as dictating the result of this appeal.

Most recently, in *Williams v. Illinois*, the Court examined application of the Confrontation Clause to forensic reports which are relied on by a testifying expert, but which are not admitted into evidence. 132 S.Ct. at 2227–28. *Williams* addressed " 'the constitutionality of allowing an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves admitted as evidence.' " *Id*. at 2233 (quoting *Bullcoming*, 131 S.Ct. at 2722 (Sotomayor, J., concurring in part)).

In *Williams*, two DNA profiles were produced. One profile was obtained from a vaginal swab from a rape victim and the other from a sample of the defendant's blood. *Id*. at 2227. The testifying expert was not involved in obtaining or testing the DNA obtained from the victim; rather, her opinion was based on notations within documents admitted as business records. *Id*. The expert did not testify to how the testing laboratory (Cellmark) handled or tested the sample or to the accuracy of the profile created from the sample, and the report itself was not admitted into evidence or shown to the jury. *Id*. at 2227, 2230. However, the expert testified that the DNA profile recovered from the defendant's blood matched "the male DNA *profile found in semen from the vaginal swabs. . . .*" *Id*. at 2236 (emphasis in original). The defense asserted that the

9

Confrontation Clause prohibited the expert from testifying regarding testing performed by Cellmark. *Id.* at 2231.[4]

The case was again determined by Justice Thomas' fifth vote, however, this time Justice Thomas concurred with the previously dissenting Justices—Chief Justice Roberts, and Justices Kennedy, Breyer, and Alito—finding no Confrontation Clause violation. *Id.* at 2255 (Thomas, J., concurring). The plurality held that even if the Cellmark report had been admitted into evidence, there would have been no violation of the Confrontation Clause for several reasons: (1) "The Cellmark report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach"; (2) "[t]he report was produced before any suspect was identified"; (3) the report was not sought "for the purpose of obtaining evidence to be used against [the defendant], who was not even under suspicion at the time"; and, (4) the DNA profile produced "was not inherently inculpatory." *Id.* at 2228.

The plurality determined that, unlike the forensic reports in *Melendez-Diaz* and *Bullcoming*, the DNA profile generated in *Williams* was not created in order to be used as evidence against a particular defendant. *Id.* at 2243. At the time the report was produced, the defendant was neither in custody nor under suspicion, and the technicians who prepared the profile didn't know whether the results would be incriminating. *Id.* at 2243–44. Therefore, the plurality reasoned that the primary purpose of the technician's report was not to create evidence against the defendant, but was "to perform his or her task in accordance with accepted procedures." *Id.* at 2244.

Justice Thomas, in his concurrence, agreed that the profile was not testimonial but solely because it lacked the requisite formality and solemnity. *Id.* at 2255 (Thomas, J., concurring). He rejected the plurality's new requirement that a statement must target a particular individual to be testimonial because "[t]here is no textual justification . . . for limiting the confrontation right to statements made after the accused's identity became known." *Id.* at 2262 (Thomas, J., concurring). Likewise, Justice Kagan, writing for the four dissenting justices, rejected the plurality's accusatory requirement, as well as Justice Thomas' formality requirement, adhering to

---

[4] The expert did not have personal knowledge of the testing conducted on the defendant's blood, however, the analyst who developed the profile from the blood sample extracted from the defendant testified at trial, as did the analyst who confirmed that semen was found on the vaginal swabs taken from the victim. *Williams*, 132 S.Ct. at 2229.

the view that forensic reports are testimonial based entirely on the primary purpose test. *Id.* at 2273–74 (Kagan, J., dissenting). Justice Breyer concurred with the plurality but wrote separately to address what he believed was the true question raised: "How does the Confrontation Clause apply to the panoply of crime laboratory reports and underlying technical statements written by (or otherwise made by) laboratory technicians?" *Id.* at 2244 (Breyer, J., concurring). It is this precise question that this Court faces.

In his concurrence, Justice Breyer discussed the practical problems resulting from a requirement that every analyst involved in forensic testing must testify at trial. He concluded that an analyst's statements "lie outside the perimeter of the Clause" for both historical and practical reasons. *Id.* at 2251. Justice Breyer reasoned that, based on the historic purpose of the Clause, these types of statements would not be subject to confrontation because they do not implicate the core concerns at issue—the use of *ex parte* examinations as evidence. *Id.* at 2249–51. He expressed concern that costs resulting from a rule requiring the live testimony of every analyst involved in the testing process would cause prosecutors to forego DNA testimony and return to a reliance on eyewitness testimony. In Justice Breyer's view, an "interpretation of the Clause that risks greater prosecution reliance upon less reliable evidence cannot be sound." *Id.* at 2251. For these reasons, Justice Breyer concluded that reports of this nature fall outside application of the Confrontation Clause. *Id.*

When considering an opinion like *Williams*, in which no single rationale commands the support of a majority, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)). Because no position received support from a majority of the justices, *Williams* does not provide us a governing legal principle and this Court views the decision as limited to the unique set of facts presented in that case.[5] *See e.g., United States v. James*, 712 F.3d 79, 95 (2nd Cir. 2013); *Jenkins v. United States*, 75 A.3d 174, 176 (D.C. 2013) ("*Williams* … creates no new rule of law that we can apply in this case.").

---

[5] "The five Justices who control the outcome of today's case agree on very little . . . they have left significant confusion in their wake. What comes out of four Justices' desire to limit *Melendez-Diaz* and *Bullcoming* in whatever way possible, combined with one Justice's one-justice view of those holdings, is—to be frank—who knows what. Those decisions apparently no longer mean all that they say. Yet no one can tell in what way or to what extent they are altered because no proposed limitation commands the support of a majority." *Williams*, 132 S.Ct. at 2277 (Kagan, J., dissenting).

The facts presented by this appeal differ from both *Melendez-Diaz,* which involved a certified report that was admitted without live testimony, and *Bullcoming,* which involved a signed report that was admitted through surrogate testimony of another analyst who had no connection to the report and offered no independent expertise. *Melendez–Diaz*, 557 U.S. 305; *Bullcoming*, 131 S.Ct. 2705. Indeed, the facts appear to fall within one of the scenarios identified by Justice Sotomayor as being outside the "limited reach" of the majority opinion in *Bullcoming*. 131 S.Ct. at 2719, 2722 (Sotomayor, J., concurring in part).

Circuit courts and state courts have disagreed as to the proper application of current Supreme Court Confrontation Clause jurisprudence. *See, e.g., James*, 712 F.3d at 96 (interpreting pre-*Williams* precedent as establishing that a statement is testimonial if its primary purpose is to create a record for later use at trial); *United States v. Duron-Caldera*, 737 F.3d 988, 994–96 (5th Cir. 2013) (declining to adopt requirement that statement be accusatory), *United States v. Turner*, 709 F.3d 1187, 1192–93 (7th Cir. 2013) (considering whether jury may have considered statement as offered for its truth and whether it was accusatory); *Derr v. State*, 73 A.3d 254, 270–71 (Md. 2013) (requiring a statement to be sufficiently formalized to be testimonial).

The only consistent requirement that can be distilled from these decisions is that in order for a statement—forensic or otherwise—to be deemed testimonial, it must have been made with a primary objective of creating an evidentiary record to establish or prove a fact at trial. *Michigan v. Bryant*, 131 S.Ct. 1143, 1155 (2011); *see also Melendez-Diaz*, 557 U.S. at 324. This Court has previously addressed the definition of testimonial statements only in the context of statements made by lay witnesses, where we likewise applied the primary purpose test to determine whether a statement is testimonial. *State v. Hooper*, 145 Idaho 139, 144–146, 176 P.3d 911, 916–184 (2007) (videotape of child victim's interview with police was testimonial because it was admitted as a substitute for her live testimony); *State v. Shackelford*, 150 Idaho 355, 372–73, 247 P.3d 582, 599–600 (2010) (statements of ex-wife were not testimonial because they were offered to evaluate defendant's demeanor and not offered for their truth).

Although this Court has not previously addressed the recent developments in Confrontation Clause jurisprudence in the context of forensic evidence, our Court of Appeals has attempted to navigate these scarcely-charted waters in *State v. Kramer*, 153 Idaho 29, 278 P.3d 431 (Ct. App. 2012). During Kramer's trial for driving under the influence of alcohol, the

prosecution introduced calibration certificates for the Intoxilyzer 5000 instrument used to determine the alcohol concentration in Kramer's breath. *Id.* at 30, 32, 278 P.3d at 432, 434. Kramer argued that the Confrontation Clause required the State to produce not just the certificates but the live testimony of the people involved in certifying the machine. *Id.* at 32, 278 P.3d at 434. In a thoughtful and well-researched opinion, the Court of Appeals concluded that the certificates were not testimonial as they were not admitted as direct evidence of an element of the crime. *Id.* at 35–36, 278 P.3d at 437–38 ("The certificates here 'support one fact (the accuracy of the machine) that, in turn, supports another fact that can establish guilt (the blood alcohol level).' ") (quoting *Commonwealth v. Zeininger*, 947 N.E.2d 1060, 1069 (Mass. 2011)). As did the Court of Appeals, we conclude that our inquiry should focus on whether the technician's statements were made with a primary objective of creating an evidentiary record to establish or prove a fact at trial.

A number of courts, presented with facts similar to those in *Kramer*, have likewise held that the testimony of an expert witness who arrives at an independent conclusion is permissible under the Confrontation Clause even where other non-testifying analysts have provided underlying data or conducted portions of the testing.[6] In *Washington v. Lui*, the Washington Supreme Court held that the Confrontation Clause was not violated even though the testifying

[6] *See, e.g., Commonwealth v. Yohe*, 79 A.3d 520, 541 (Pa. 2013) (The right to confrontation satisfied when testifying expert was involved in a sufficient degree in the analysis and is not simply parroting another analyst but rather reviewed raw testing data, evaluated the results, verified the test, and wrote the report); *State v. Joseph*, 283 P.3d 27, 29–30 (Ariz. 2012) (the testifying expert relying on autopsy report prepared by non-testifying doctor did not act as an impermissible conduit because he testified to his own conclusions regarding the victim's injuries); *State v. Medicine Eagle*, 835 N.W.2d 886, 898–902 (S.D. 2013) (right to confrontation was not violated despite the fact that analysts that performed some steps of the testing did not testify at trial because the testifying expert "performed various steps of the [testing]; independently reviewed, analyzed, and compared the data obtained from the testing; and reached her own conclusions regarding the results of the testing"); *State v. Ortiz-Zape*, 743 S.E.2d 156, 163 (N.C. 2013) ("when an expert gives an opinion, the opinion is the substantive evidence and the expert is the witness whom the defendant has the right to confront"); *Marshall v. People*, 309 P.3d 943, 947 (Colo. 2013) ("We join these courts in concluding that when a lab supervisor … independently reviews scientific data, draws the conclusion that the data indicates the positive presence of methamphetamine, and signs a report to that effect that is admitted at trial, the Confrontation Clause is satisfied if she testifies and is available for cross-examination."); *Smith v. Florida*, 28 So.3d 838, 854–55 (Fla. 2009) (no Confrontation Clause violation in admission of DNA tests because supervisor evaluated raw test results, compared samples, made conclusions, and testified at trial); *Grim v. Mississippi*, 102 So.3d 1073, 1081 (Miss. 2012) (holding that "a supervisor, reviewer, or other analyst involved may testify in place of the primary analyst where that person was actively involved in the production of the report and had intimate knowledge of analyses even though [he or] she did not perform the tests first hand.") (alternation in original; internal quotation and citation omitted).

We acknowledge that the decisions of our sister states have not been in uniform agreement. *See, e.g., State v. Navarette*, 294 P.3d 435, 438–39 (N.M. 2013) (autopsy findings are testimonial when there are no "objective markers that any third party can examine in order to express an independent opinion"); *Martin v. State*, 60 A.3d 1100, 1107 (Del. 2013) (the testing analyst's representations and test results were testimonial because the statements were conclusions that the testifying expert relayed and did not make independently).

expert "did not personally observe the lab tests that underlaid her analysis" because the output of the testing, an electropherogram, would have no meaning for the jury without the testifying expert's evaluation of its significance. 315 P.3d 493, 507–09 (Wash. 2014). Rather, the preliminary steps in an analysis are essentially part of the chain of custody, and evidence of these steps merely goes to the weight and not the admissibility of the result. *Id*. Similarly, the Indiana Supreme Court held that the technician who transferred the blood from pieces of glass to swabs for later testing and analysis was just one person in the chain of custody, and as such, the defendant's right to confrontation was not violated because the expert who conducted the analysis and prepared the report testified at trial. *Speers v. State*, 999 N.E.2d 850, 854–55 (Ind. 2013). In these cases, the underlying statements did not have an evidentiary purpose, and were thus not testimonial, because only the expert's independent conclusion served as evidence. *Lui*, 315 P.3d at 510; *Speers*, 999 N.E.2d at 855.

A defendant's right to confrontation is violated when "an expert acts merely as a well-credentialed conduit," and does not provide any independent expert opinion. *United States v. Ramos-Gonzalez*, 664 F.3d 1, 5–6 (1st Cir. 2011) (testimony violated Confrontation Clause because expert simply recounted results of another expert's testing). These courts finding statements to be testimonial have done so when the expert has relayed another analyst's conclusion that was not reached independently by the testifying expert. *See, e.g., State v. Navarette*, 294 P.3d 435 (N.M. 2013). In *Navarette*, the testifying expert relied on the findings of another analyst—who concluded that there was gunpowder residue on the victim—to determine how close the shooter was to the victim. *Id*. at 436–37. The court held that the analyst's findings were testimonial because there were no "objective markers that any third party can examine in order to express an independent opinion." *Id*. at 438–439. However, when an expert independently evaluates objective raw data obtained from an analyst, and exercises his or her own judgment in reaching a conclusion, the expert is not a conduit for the analyst's conclusion. *United States v. Summers*, 666 F.3d 192, 201–202 (4th Cir. 2011). Rather, the testifying expert's opinion is an "original product" that can be readily "tested through cross-examination." *Id*. at 202 (internal quotations and citation omitted). We join the majority of jurisdictions considering this subject and focus our attention on the question whether the primary purpose of the lab technician's act of labeling the slides and the implicit assertion that the proper stain was applied

14

was intended to establish some fact at trial and whether Dr. Rorke-Adams served as a mere conduit.

**b. Application of the Confrontation Clause analysis to Dr. Rorke-Adams' testimony**

Dr. Rorke-Adams testified that the slides she examined contained the brain tissue of W.F., and that this tissue had been stained with the amyloid antigen. Stanfield contends that Dr. Rorke-Adams' testimony relied on two assertions made by the technician: (1) that the slides were labeled with the correct case number, and thus contained W.F.'s brain tissue; and (2) that the technician applied the proper stain to the samples in accordance with the laboratory protocol, thereby permitting an accurate interpretation of the samples.

Dr. Rorke-Adams testified that she received W.F.'s brain from Dr. Garrison after he had conducted the autopsy, that the brain tissue was labeled when she received it, and that the tissue slices were sent to the technician with the same label. The slides that Dr. Rorke-Adams received back from the technician were also labeled. At trial, the following exchange occurred:

> [The prosecutor]. When the tissues arrived in your office, are they marked with who the tissues belong to?
> Dr. Rorke-Adams. Yes, of course. They're labeled.
> [The prosecutor]. And when you go to do your examination of these tissues, are they still labeled?
> Dr. Rorke-Adams. Yes.
> [The prosecutor]. And the technician that put the stain on the tissues, does she write any reports?
> Dr. Rorke-Adams. No. She – we write the report. She has documentation to the fact that she received the tissue, the stain that we requested her to do, and she notes when she did it, and then when she handed it back to us. Those are the only pieces of documentation. This is the standard procedure in the laboratory for every case.
> And so the label of the material is attached to the material. It remains with the material. Then the slides are prepared by the technician and the slides are labeled with the same number that was attached to that specimen so we know that Specimen 500 came from John Smith. And so we evaluate – we evaluate it, write a report, and that report goes into the permanent record.

Dr. Rorke-Adams testified that she did not observe the technician prepare the slides, however, she explained that she was able to determine if the correct stain had been applied:

> [The prosecutor]. Are you able to tell when your technician places the stain on these tissues whether the stain has been properly applied or not?
> Dr. Rorke-Adams. Yes. Because there's always a control slide that goes with it. Control slide means that – in this particular case, I asked for a specific antibody to be applied to this tissue.

15

. . . .

>We fill out a request sheet. We ask specifically for that antibody to be applied to the tissue. It's given to the technician along with the specimen. The technician then knows which antibody to use. Those technical procedures are done in that special laboratory.

>And then that prepared slide is given to the pathologist along with the sheet, the request sheet that we made out asking for that antibody, plus a control slide, which means that another piece of tissue that was known to contain this particular antigen that we're interested in has been used to corroborate the validity of the stain from the unknown slide.

>So we look at the control slide first to make certain that the technique was working so that we can rely then upon what we're looking at in the unknown slide.

>So these are all standard procedures in the laboratory, and this is the way it is done every day for all of the cases that come through.

Dr. Rorke-Adams testified this procedure was followed in this case.

Thus, Dr. Rorke-Adams had personal knowledge that the slides were stained correctly based on her comparison of the slides with the control slide. Based upon this testimony, Dr. Rorke-Adams did not rely upon an implied assertion by the technician that the slide had been properly prepared. Therefore, the only remaining implied assertion is that the labeling of the slides represented that the slides contained W.F.'s tissue.

As in *Lui* and *Speers*, the labeling occurred during preliminary steps for Dr. Rorke-Adams' forensic examination. The technician did not make any conclusions or factual findings as to any issue to be decided at trial when she labeled the slides and the technician's assertion had no probative value as to Stanfield's guilt or innocence. Rather, the act of labeling was manifestly for a laboratory—rather than trial—purpose: to identify the samples while they awaited Dr. Rorke-Adams' examination. Further, while assertions need not be contained in formalized affidavits or admitted at trial to be testimonial, the fact that the technician did not prepare a report suggests that her purpose in labeling the slides was not to establish any fact at trial. The only testimony the technician could have supplied would be to attest that she did not alter the integrity or identity of the tissue samples. This is akin to the type of assertion made by any person whose name appears in a chain of custody. As the Supreme Court held in *Melendez-Diaz*, the right to confrontation does not mandate that the prosecution call every person involved in the chain of custody. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 n. 1 (2009).

Further, like the calibration certificates in *Kramer*, the technician's assertions were not admitted as direct proof of an element of the crime; rather, they were admitted as foundation for

the introduction of the results of Dr. Rorke-Adams' testimony regarding her examination of the samples and the conclusions she drew therefrom, i.e., that W.F. died from non-accidental trauma. These findings and conclusions were derived from Dr. Rorke-Adams' personal examination and observations of the slides. Unlike the analyst in *Navarette*, the technician in this case made no independent conclusions and the labeling did not prove any fact relevant to Stanfield's guilt or innocence.

For these reasons, we hold that there was no Confrontation Clause violation because the technician's assertions were not made for an evidentiary purpose and thus were not testimonial.

2. Dr. Rorke-Adams' testimony was not inadmissible hearsay.

Much like her Confrontation Clause objection, Stanfield argues that Dr. Rorke-Adams' testimony regarding the contents of the slides and her testimony regarding the staining and accuracy of the slides constitute inadmissible hearsay. Stanfield contends that Dr. Rorke-Adams did not have an "independent basis of knowledge so as to testify that the assertions of the laboratory technician were accurate." The State responds that Dr. Rorke-Adams did not relay impermissible hearsay evidence but rather testified to the routine practices of her laboratory and to matters that were within her personal knowledge, as permitted by I.R.E. 406.[7] Initially, we note that while Dr. Rorke-Adams testified regarding her laboratory's routine procedures, she also testified that those procedures were followed in this case and that the slides contained W.F.'s brain tissue.[8] This testimony provided facts that were specific to this case and as such, exceeded that allowed under Idaho Rule of Evidence 406.

Hearsay is defined as an out-of-court statement that is offered "to prove the truth of the matter asserted." I.R.E. 801(c). Therefore, Dr. Rorke-Adams' testimony that procedures were followed and that the slides contained W.F.'s brain tissue was hearsay.[9]

Generally, hearsay evidence is not admissible at trial unless it falls under one of the recognized hearsay exceptions. I.R.E. 802; *State v. Watkins*, 148 Idaho 418, 423, 224 P.3d 485, 490 (2009). However, an expert witness is allowed to base an opinion on: "(1) facts within [her] personal knowledge; (2) facts presented to [her] at trial; or (3) facts presented to [her] outside of

---

[7] "Evidence of a habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." I.R.E. 406.

[8] As explained previously, we find that Dr. Rorke-Adams had independent knowledge regarding the administration of the proper stain to the slides based upon her comparison of the slides to a control slide.

[9] The claim that the slides contained W.F.'s tissue is of particular importance; if this assertion were not true, then Dr. Rorke-Adams' testimony would have been irrelevant.

17

court, but not perceived by [her] personally, if those facts are the type of facts reasonably relied upon by experts in [her] field in drawing such conclusions." F.R.E. 703, Comment 1[10]; F.R.E. 602; I.R.E. 703; I.R.E. 602; *see also Watkins*, 148 Idaho at 426, 224 P.3d at 493. Idaho Rule of Evidence 703 provides that:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

I.R.E. 703. This rule permits an expert witness "to state an opinion based on inadmissible evidence and to indicate the general nature of the sources on which the expert has relied, but not to disclose, directly or indirectly, the contents of the sources on direct examination unless they are otherwise admissible, or the court makes the required balancing determination." *Watkins*, 148 Idaho at 426-27, 224 P.3d at 493-94. "The intent of the rule is just that the opinion does not have to be excluded because part of the basis was evidence that would not be admissible itself." *Id.* at 426, 224 P.3d at 493 (quoting Evidence Rules Advisory Committee Minutes of Meeting of November 2, 2001 at 3.).

In 2002, the rule was amended to clarify that I.R.E. 703 should not be used as "a back door for getting this evidence in the record." *Id.* The amendment "serves to prevent an expert witness from serving as a conduit for the introduction of otherwise inadmissible evidence." *Id.* at 427, 224 P.3d at 494. The amendment was not intended to change the meaning of I.R.E. 703; rather, it was intended to clarify its limitations. Thus, expert testimony that does nothing more than relay otherwise inadmissible hearsay to the jury is barred by I.R.E. 703. *Id.* However, no error occurs if the hearsay evidence the expert relies upon is referenced but not actually introduced as evidence at trial. *See, e.g., Doty v. Bishara*, 123 Idaho 329, 336, 848 P.2d 387, 394 (1992).

---

[10] The Idaho Rules of Evidence were modeled on the Federal Rules of Evidence "in order to obtain uniformity in the trial practice in both the state and federal courts." *Chacon v. Sperry Corp.*, 111 Idaho 270, 275, 723 P.2d 814, 819 (1986). Thus, we seek to interpret identical rules "in conformance with the interpretation placed upon the same rules by the federal courts." *Id.*

In *Doty*, this Court upheld the admission of an expert's opinion testimony as the cause of tire damage even though his opinion was based, in part, on photographs and notes prepared by another expert who had also examined the tire. *Id*. The expert was allowed to testify "concerning observations made by" the other expert. *Id*. at 335–36, 848 P.2d at 393–94. Likewise, in *Lawton v. City of Pocatello*, a case concerning a motorcycle accident, this Court upheld the admission of the testimony of an expert who opined that the accident site was dangerous and did not meet existing design standards. 126 Idaho 454, 464, 886 P.2d 330, 340 (1994). The expert's testimony referred to reports of other accidents that had occurred in the same area, although the reports were not admitted into evidence. *Id*. This Court found no error in the introduction of this testimony. *Id*. Although these cases were decided prior to the 2002 amendment, they reflect the meaning of the current rule. *See Watkins*, 148 Idaho at 426, 224 P.3d at 493.

Idaho Rule of Evidence 703 was most recently interpreted in *State v. Watkins*. *Id*. In that case, this Court held that I.R.E. 703 did not allow an expert witness to reveal the contents of another expert's notes, even though the testifying expert relied on those notes and the notes were not themselves admitted into evidence. *Id*. at 427, 224 P.3d at 494. In that case, the State's expert, Dr. Finis, testified that:

> according to tests performed at her private laboratory, Identigenetix, Watkins' DNA was in the semen on the girl's underwear and inside the condom and the girl's DNA was on the outside of the condom. Dr. Finis, however, was not at Identigenetix to receive the evidence in person and did not perform the DNA testing herself. Instead, Dr. Finis relied on communications with her colleague, Kermit Channell, as well as his notes, in forming her conclusions about the tested evidence.

*Id*. at 420, 224 P.3d at 487. Specifically, Dr. Finis testified that she did not do the testing and was not present for Channell's testing but, according to Channell's notes:

> Channell used an oral swab taken from the six-year-old girl to establish a reference DNA sample for her; that Channell used both penile and oral swabs taken from Watkins to establish a reference DNA sample for him; and that Channell extracted DNA from both the inside and outside of the used condom and tested it to see whether it matched either Watkins' or the six-year-old girl's DNA. Dr. Finis testified that the DNA Channell tested on the inside of the condom matched Watkins' DNA and that the DNA Channell tested on the outside of the condom was a mixture of both Watkin's [sic] DNA and the six-year-old girl's DNA.

*Id*. at 423–24, 224 P.3d at 490–91. This Court explained that the testimony was not admissible under I.R.E. 703 because it was evident that Channell's statements were not admitted for the

limited purpose of evaluating Dr. Finis' testimony. *Id*. at 427, 224 P.3d at 494. Rather, they were relayed "for the purpose of demonstrating the chain of custody, Channell's testing methodology, and to identify the locations on the condom and panties on which Watkins' and the victim's DNA were found." *Id*. We further observed that no evidence, aside that contained in Channell's notes, was introduced to establish these facts. *Id*.

In this case, Dr. Rorke-Adams testified that the slides she examined contained the brain tissue of W.F. and that those slides were stained properly. As was the case with the expert in *Doty*, who relied on pictures and notes created by another expert, Dr. Rorke-Adams' conclusions were based in small part on the labeling created by the technician. However, Dr. Rorke-Adams relied far less on the technician's actions than did the expert whose testimony we upheld in *Doty*. Dr. Rorke-Adams did not testify "concerning observations made by" another expert but rather explained why she could conclude that the slides belonged to W.F. and why she could observe the amyloid antigens in W.F.'s tissue.

Unlike *Watkins*, the technician's assertions were not the only evidence that established the chain of custody or the testing methodology employed. In this case, Dr. Rorke-Adams received the tissue, partially prepared the tissue by slicing it, sent the tissue to the laboratory and received the tissue back from that laboratory.

Further, unlike the situation in *Watkins*, where the testifying expert relayed factual findings and conclusions reached by another, the technician here did not make any factual findings. Dr. Rorke-Adams did not relay any conclusions that were drawn by the technician. Rather, it was Dr. Rorke-Adams who conducted the examination of the tissue, documented her factual findings, and formed her own opinion. Thus, we find that Dr. Rorke-Adams did not act as a conduit for inadmissible hearsay, but rather indicated the "general nature of the sources" she relied on in forming her opinion as permitted by I.R.E. 703. *Watkins*, 148 Idaho at 426–27, 224 P.3d at 493–94. Even though the district court did not explicitly apply the balancing test required by I.R.E. 703, we conclude that the district court did not err by permitting Dr. Rorke-Adams' testimony.

**B. The district court properly instructed the jury as to the elements of first degree murder.**

Stanfield contends that first degree murder by aggravated battery on a child under twelve is a specific intent crime. Thus, Stanfield contends that the jury was required to find that she specifically intended to cause great bodily harm to W.F., as opposed to finding that she

20

committed battery, and in doing so, unintentionally caused great bodily harm. She therefore argues that the district court violated her right to due process when it instructed the jury that they did not have to find that she intended to commit murder or to inflict great bodily harm in order to find her guilty of first degree murder.

Stanfield advanced this argument prior to this Court's decision in *State v. Carver*, 155 Idaho 489, 314 P.3d 171 (2013). In *Carver*, this Court addressed an identical claim and held that "the district court correctly instructed the jury that Defendant would be guilty of first degree murder if he committed a battery upon the child which resulted in great bodily harm, from which the child died." *Id*. at 494, 314 P.3d at 176. In this case, the district court gave the same instruction as we upheld in *Carver*.[11] The district court did not err in instructing the jury as to the elements of the offense. Thus, Stanfield has not shown that the district court violated her due process rights.

## IV. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

Chief Justice BURDICK, Justice EISMANN and Justice Pro Tem WALTERS, **CONCUR**.

---

[11] The instruction at issue in *Carver* said that, "In order for the defendant to be guilty of First Degree Murder in the perpetration of an aggravated battery upon a child under twelve (12) years of age . . . the state does not have to prove that the defendant intended to kill [the child], but the state must prove that during the perpetration of an aggravated battery on a child under twelve (12) years of age, the defendant killed [the child]." 155 Idaho at 492, 314 P.3d at 174. At Stanfield's trial, the district court instructed the jury: "In order for the defendant to be guilty of first degree murder . . . the state does not have to prove that the defendant intended to kill [W.F.], but the state must prove that during the perpetration or attempt to perpetrate an aggravated battery on a child under 12 years of age, the defendant killed [W.F.]."